# EXHIBIT A

## AMERICAN ARBITRATION ASSOCIATION

Case No. 01-16-0000-2652_____

OSRAM SYLVANIA, INC., Claimant,

*v.*

PHOTOGRAPHIC ILLUSTRATORS CORPORATION,

Respondent/Counter/Claimant And Third-Party Claimant,

*v.*

BROOK ELECTRICAL SUPPLY COMPANY; CAPITAL LIGHTING &  SUPPLY, LLC d/b/a CAPITALTRISTATE; FACILITY SOLUTIONS GROUP, INC.; FROST ELECTRIC SUPPLY CO. d/b/a FROSTELECTRIC.COM; STUART C. IRBY COMPANY  d/b/a  IRBY.COM;  McNAUGHTON-McKAY  ELECTRIC  CO.;  And TRADE SERVICE CO., LLC,

Third-Party Respondents

_____

## PARTIAL FINAL AWARD

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the

arbitration agreement entered into between the above-named parties and signed June 22, 2006,

with an effective date of June 1, 2006 as amended on September 30, 2008 and having been

duly sworn, and having duly heard the proofs and allegations of the Parties, hereby issue this

Partial Final Award as follows:

These are my findings of fact and conclusions of law in this Arbitration which primarily involves claims between Respondent Photographic Illustrators Corporation ("PIC") and Claimant Osram Sylvania, Inc. ("OSI" or "Sylvania").  PIC and Sylvania have a long history together, dating from the late 1960s through September 30, 2012 up to and including this Arbitration.

## INTRODUCTION

Sylvania is a well-known manufacturer and seller lighting products.  During their relationship, PIC provided commercial photography services to Sylvania principally through Paul Kevin Picone ("Picone"), who was described by Michael Foote("Foote"), a former in-house photographer at OSI as "probably the best lighting application photographer in the world." Tr.2267.  I learned during this Arbitration that taking photographs of light bulbs is difficult, and taking photographs of lighting applications, lights actually delivering light, is even more complicated.  Picone was a self-taught photographer who delivered excellent work to Sylvania and for other companies such as Gillette and Friendly's Ice Cream.

For most of Picone's relationship with Sylvania, he performed his services pursuant to the terms of a single page License (the "License") (PIC-114A) which appeared to be a standard form agreement prepared by a professional photographers association or perhaps by PIC's legal counsel.  During the late 1990s through January, 2016, PIC was represented by Michael Rader, an intellectual property attorney with the Boston law firm Wolf Greenfield, a prominent and highly regarded intellectual property firm.  The License was provided by PIC to

licensees such as Sylvania on the reverse side of written requests for services and spelled out in detail the terms of PIC's engagement.

The one page License was explicit in its terms and provided in clear and unequivocal language that PIC retained ownership of its photographic Images and the copyrights in them. The License provided that the rights to the photographic Images being licensed were transferred "only upon" the client's acceptance of all terms contained in the License, the receipt of payment by PIC and the use of proper copyright notice and other Copyright Management Information ("CMI") (CMI "means the name and other identifying information of Licensor, terms and conditions for uses of the Images and such other information that Licensor may prescribe."). PIC-114A. Para 9   The License specified: "Licensor is willing to license the Image(s) only upon the condition that Client accepts all of the terms of this Agreement." Id.  The language of the License left no doubt that any transfer of right by PIC was expressly conditioned upon Sylvania's compliance with the provision of Para 9, including the use of PIC's copyright notice and CMI on the Images.

The reason photographers want their copyright notices or other attribution put on or included with their works is for the promotional value; it is part of how they advertise their work and attract prospective customers.  Picone identified Gillette as a company that had come to him after seeing his work. In addition to the proper use of PIC's copyright notice, the License further provided that it was non-exclusive and its duration was one year from the date of PIC's invoice and for English language use in the United States only.  The Licensee (Sylvania) was also required to return the Image to PIC on the return date noted or within thirty days after first publication or use by the licensee.  These were the terms under which PIC and Sylvania operated

3

until June 30, 2006. The PIC Images provided to Sylvania under the License were used by Sylvania in marketing its lighting products.

Sometime in the early 2000s, PIC asserted that Sylvania had violated the terms of the License for certain PIC Images, apparently by using the Images beyond the temporal and/or geographical limits specified and perhaps by Sylvania's failure to use PIC's copyright notice with the Images.  When that occurred, Mr. Picone and his lawyer Mr. Rader complained to Sylvania, principally to Michael Colotti, who then was a Vice President with Sylvania, in charge of Marketing and Communications. Mr. Picone and Mr. Rader threatened Sylvania with copyright infringement for violating the terms of the License.  Mr. Colotti testified that at one point Sylvania was facing the very unattractive and presumably expensive prospect of having to pull packaging and thus product from stores because of its failure to comply with the copyright terms of the License. Tr. 1622

Thus, in 2005, Sylvania and PIC through their respective counsel with input from Mr. Picone and Mr. Colotti embarked upon a somewhat lengthy negotiation in an attempt to reach a settlement and long term agreement that would avoid the infringement problems facing Sylvania. Tr. 1636  Sylvania wanted to put behind it the disputes with PIC, as well as the threats of litigation and business interference by entering into a long term, comprehensive license agreement with PIC that would give Sylvania the use of the PIC Images in perpetuity anywhere in the world.  Sylvania wanted more latitude to Use Images in marketing and packaging. Tr. 1628 (Colotti)  Similarly, Picone, who was then in his early 60s, sought a new long term relationship that would  compensate him appropriately and that would provide a suitable way to finish his career before retirement. See PIC-531 Draft Term Sheet.

Mr. Picone's recollection of the details of the negotiations of the new agreement twelve years ago was limited, and Mr. Colotti's memory was at higher level, reflecting Sylvania's purpose in entering the new agreement without providing negotiation details from 2005 and 2006. The parties through counsel exchanged drafts of a potential new agreement, and while some of the negotiation documents and emails were put into evidence, none of the agreement drafts was put into evidence, and neither negotiation counsel testified.  Mr. Rader represented PIC in those negotiations, and John Mitchell, Sylvania's in-house intellectual property counsel represented Sylvania.  Rader was and is an experienced and well qualified intellectual property lawyer. He was eminently qualified, as presumably was Mitchell, to draft an agreement that reflected the intentions of the parties and that included the necessary terms for dealing with PIC's copyrights in its photographic Images.  In particular, had PIC wanted an Agreement with the unequivocal copyright terms of the License, Mr. Rader and Mr. Picone were capable of and knew how to draft such a document; and they could have insured such conditional, emphatic language was  in the new agreement.  That, however, definitely was not what Sylvania wanted at that point, and it would not have agreed to such terms.

Negotiations began in 2005 and extended for many months. On March 15, 2006, during negotiations, Picone sent Colotti a new proposal that was intended to finally resolve the outstanding disputes and claims and provide the basis for a new six year agreement.  Those terms with modification became the structure of a new relationship.  OSI-452  Picone testified that had Sylvania been willing to pay additional consideration he was prepared to convey his copyrights to Sylvania, and until he saw the new agreement he thought he was conveying them to Sylvania under the new agreement. Tr. 151:5-22 That did not happen, however.

On June 22, 2006, Sylvania and PIC entered into an Agreement (the "Agreement") which was signed by Picone and by Colotti.  The Agreement, unlike the one page License, is sixteen pages with eleven pages of Exhibits (A-E). It is a comprehensive document that is intended to provide for a complex six year business arrangement.  By its initial terms the Agreement ran for six years until June 30, 2012, but later was amended to run until September 30, 2012. J-2; J-19  Although under the Agreement  Sylvania  acquired the rights to use the PIC Images any way it wanted,  in perpetuity anywhere in the world, and although Picone had been willing to convey his copyrights to Sylvania for a larger payment under the Agreement, PIC still owned the copyrights to the Images it had provided in the past and that it would provide Sylvania in the future.

During the course of their six plus years under the Agreement, PIC and Sylvania had occasional disagreements and disputes but they persisted through the term of the Agreement. Sylvania did not renew the Agreement, and it terminated on September 30, 2012.  Prior to termination, in 2010 and 2012, PIC presented Sylvania with "Rush Charges" it had billed Sylvania under Exhibit C to the Agreement.  Furthermore, by at least 2011, PIC had learned that copies of the PIC Images in which it owned the copyrights were appearing on the internet without a PIC copyright notice or attribution, contrary to the terms of the Agreement.  The internet sites for those Images belonged to Sylvania's customers that had received the PIC Images from Sylvania, and when PIC sued Sylvania's customers for copyright infringement, Sylvania intervened.

## PROCEDURAL BACKGROUND

PIC filed more than thirty copyright infringement actions against Sylvania's customers in federal courts in Massachusetts and elsewhere. Sylvania intervened in the federal cases that had been consolidated in the District of Massachusetts before Judge Young, who granted Sylvania's motion to refer the disputes between PIC and Sylvania to arbitration. In Para 38 of the Agreement, the parties agreed to arbitrate all disputes relating to the Agreement in accordance with the rules of the American Arbitration Association. The forum specified in the Agreement is Essex County, Massachusetts.  Both parties waived the forum provision on the first day of the Arbitration  and agreed to have the matter heard in Boston, Massachusetts. Tr. 7:1-7

Sylvania filed its Demand for Arbitration on January 26, 2016 asserting claims for breach of the covenant of good faith and fair dealing, for violation of M.G.L 93A, for tortious interference with business relationships, for unjust enrichment, for violation of the RICO statute, for declaratory judgment regarding the rights and obligations of PIC and Sylvania under the Agreement and for attorneys' fees and costs.  Sylvania also sought declaratory relief concerning the claims that had been asserted by PIC against Sylvania's customers and distributors. Among the Sylvania distributors against which PIC was asserting or threatening claims were Third Party Respondents Brook Electrical Supply Company ("Brook"); Capital Lighting & Supply, LLC, d/b/a CAPITALTRISTATE ("Capital"); Facility Supply Group, Inc. ("Facility Supply"); Frost Electric Supply  Co., d/b/a FROSTELECTRIC.COM ("Frost"); Stuart C. Irby Company, d/b/a IRBY.COM ("Irby"); McNaughton-McKay Electric Co.("McNaughton") (the "Distributor Defendants").  In addition, Trade Service Co., LLC ("Trade Service") an aggregator of data that was provided to the Distributor Defendants also was named as a Third Party Respondent.

PIC filed its First Amended Counterclaims in the Arbitration on October 21, 2016, alleging twelve claims for relief, including breach of contract, claims relating to copyright

infringement, claims asserting violation of the Digital Millennium Copyright Act, a claim for interference with advantageous relations, a claim for breach of the duty of good faith and fair dealing, trade mark claims, a claim for violation of M.G.L. 93A and declaratory judgment.  PIC, OSI and the Third Party Respondents have agreed to submit certain of their claims and disputes to this Arbitration.

Trade Service has filed a motion to dismiss PIC's secondary liability claims against it because the parties did not agree to submit them to arbitration.  PIC has not opposed that motion, and it hereby is granted.

Sylvania also filed procedural motions during the Arbitration to strike the testimony and Infringement report of Len Bucchino.  That motion is denied.  I found Mr. Bucchino's testimony to be credible and his report reliable.  I also find that his initial contingency fee compensation arrangement was not disqualifying.  He did not testify as an expert and his compensation arrangement was changed promptly when counsel learned of it. Nor is his billing rate unreasonable or suspicious.  While not an expert, he provided skilled services to counsel and his rate was not inappropriate.

Similarly, Sylvania's motion to strike the Sullivan Report is denied.  Dr. Sullivan is qualified in his field.  Although Sylvania took issue with his findings, disagreement is not a basis to strike the report. I deal with these motions in more detail in the legal discussion at the end of the Award.

## **SUMMARY OF FINDINGS**

This Arbitration and the parties' claims and defenses in the first instance come down to the meaning of the terms of the Agreement and the intent of the parties in executing it. PIC asserts that, as with the License, Sylvania's Use of the PIC Images under the Agreement was conditional upon compliance with certain terms of the Agreement and that Sylvania's failure to comply with those conditions was copyright infringement.  Sylvania counters that any Use of the PIC Images under the Agreement was not conditional, although its Use of the PIC Images may have been subject to certain contractual obligations, or covenants, and thus it cannot be liable for copyright infringement.

This condition/covenant dichotomy has pervaded this matter and ultimately determines whether PIC is entitled to a finding of copyright liability and damages.  After much consideration, as more fully explained during this Award, I find that Sylvania's view of the Agreement is the proper one and that its contractual obligations with regard to the Use of the PIC Images in Para 9 and the inclusion of the PIC copyright/attribution on or near PIC Images in Para 10.b were **not** conditions to Sylvania's license tax Use the PIC Images.

Sylvania desired and it was the understanding and the intent of the parties by the Agreement to insure that going forward Sylvania would have the unfettered right to Use the PIC Images and that its customers would be able to Use them as well. Tr. 1729 (Colotti). Sylvania's intent in entering into the Agreement was to avoid any possibility of repeating the past infringement problems it had had with PIC.  Sylvania's clear failure to include the PIC copyright/attribution on or with PIC Images that appeared primarily on the internet, however, was a breach of the terms of the Agreement, giving rise to contract damages, but not copyright

infringement.   PIC adamantly asserts that its copyrights and attribution have always been paramount to Mr. Picone and thus the attribution provisions of the Agreement that Sylvania violated must be conditions that give rise to copyright infringements. That position, however, ignores the contract negotiations, Sylvania's clear goal in entering the Agreement, and the very equivocal and lax language in the attribution provisions.  Mr. Picone did care about attribution and its attendant promotional value, and he received those promotional rights in the attribution provisions as contractual obligations of Sylvania, not as conditions to Sylvania's Use of the PIC Images.   As noted above, both Rader and Picone knew how to employ the language of conditions, just as they had in the License, and their failure to do so in the Agreement prevents PIC's copyright claims.

This has been a contentious and vigorously litigated matter.  There are numerous claims and counterclaims on both sides.   Twenty-five witnesses testified, plus deposition testimony; there were twelve days, sometimes long days, of testimony; and hundreds of exhibits, some of which themselves consisted of hundreds if not thousands of pages.  In addition to the fact witnesses, there were seven expert witnesses:  two in photography, three in computer and data forensics, and two in damages.  The parties submitted extensive briefs, rebuttal briefs, post hearing briefs and lengthy proposed findings.  There was much at stake financially for both sides, with claims climbing into the hundreds of millions of dollars, but ultimately many of the claims fall by the wayside as the dispute largely becomes one for breach of contract.  For that PIC is entitled to meaningful damages.  I have summarized and adopted portions of each party's very lengthy proposed findings, because the trial testimony and even many of the operative facts are not in real dispute although their significance and meaning are.  I have added my own findings when necessary.  I have considered carefully the legal arguments on both sides,

analyzing their factual and legal contentions concerning covenants and conditions, copyright law, the DMCA and damages. I have reviewed the expert reports, in some cases several times to appreciate the analyses and opinions. I reached my findings and conclusions only after much thought and time reviewing and evaluating the legal briefs, the testimony, the exhibits and the arguments of counsel.  Because of my ultimate findings on some of the claims, it has not been necessary to address in this Award each of the factual and legal arguments advanced by counsel.

## FINDINGS

Starting in the late 1960s Paul Picone, PIC's principal, served as a photographer for Sylvania (or, more specifically, Sylvania's corporate predecessors).[1]  During the course of his relationship with Sylvania, Mr. Picone generated thousands of images ("Images") for the company, depicting not only images of Sylvania lighting products but a vast array of other images as well.  The parties' relationship continued for decades, ending only on September 30, 2012.  Mr. Picone's longstanding relationship with Sylvania had allowed him an opportunity to forge relationships with Sylvania employees.[2] Tr. 1607-08; 1619-14; 1621-16  His work was known and very well regarded within Sylvania.  That is why it retained his valuable services for so many years.

The seeds of the current dispute were planted more than a decade ago.  Sometime before 2006, a dispute arose between PIC and Sylvania relating to Sylvania's use of PIC's images under

---

[1] Tr. at 110:15-18.

[2] Tr. at 14:16-17, 1619:9-14, 1837:9-15.

the License. PIC-114A.[3]  PIC contended that Sylvania had used PIC images outside of the temporal and/or geographical limits of the License and perhaps had failed to Use PIC's copyright notice with its Use of the Images, thus violating conditions of the License.  PIC and its counsel Michael Rader threatened litigation against Sylvania for copyright infringement which led to negotiations between PIC and Sylvania for a settlement agreement and a new licensing arrangement.  Those negotiations took place primarily between the parties' counsel Rader and John Mitchell, Sylvania's in-house counsel.  Tr.  109-110;121;414;(Picone);1636;1669-1670 (Colotti) During those negotiations PIC offered Sylvania "an unlimited license to use [PIC's] images worldwide, in any medium, and for [an] unlimited time" if Sylvania agreed to pay PIC a nonrefundable royalty and a surcharge over PIC's standard professional fees on projects going forward.[4]  OSI-452   As Picone testified at the Arbitration, he actually was prepared to convey his copyrights to Sylvania if he had received additional financial consideration under the Agreement, and he, in fact, thought those were going to be the operative terms. Tr. 15:l5-22.

Ultimately the parties agreed to a $3 million royalty, a monthly retainer of $50,000 for the six years of the agreement against professional fees of $3.6 million and other payments. The parties intended their Agreement to "eliminate the need for a tracking system," which meant Sylvania would no longer have to worry about how it was using the Images or whether it was satisfying temporal or geographical limits on its use of the PIC Images.[5]  As Picone testified, he understood the "foundation" of the license was to "allow Sylvania to allow its own customers to

---

[3] Tr. at 1537:3-22; *see also id.* at 111:20-24.

[4] Tr. at 687:13-688:24, 708:22-709:7; OSI-452, 2-3; OSI-232 .

[5] *Id.*; *see also* Tr. at 1496:20-1497:14.

12

help promote products in some way, and to use those images in any way they could."[6] Rader also confirmed that the Agreement would allow for Sylvania's customers to use PIC's Images as long as Sylvania did not become a competitor to PIC by licensing the Images for a fee. J-220

 The parties' negotiations during the first half of 2006 culminated in the execution of the 2006 License Agreement (the "Agreement").  The Agreement settled the parties' outstanding disputes, provided Sylvania with a perpetual license to Use all of the  PIC's images  any way it wanted, anywhere in the world, and continued the relationship through at least the first half of 2012. J-2 The Agreement later was amended to run through September 30, 2012. J-14 The Agreement did have other limitations in the form of covenants in Paragraphs 9 and 10. J-2

 In return for the non-refundable royalty payment, in Paragraph 9 of the Agreement, PIC granted Sylvania a "non-exclusive, worldwide license in and to all the Images and the copyrights thereto to freely Use, sub-license Use, and permit Use, in its sole and absolute discretion, in perpetuity, anywhere in the world."[7] J-2 Reflecting the breadth of PIC's copyright license to Sylvania, the parties gave the word "Use" in Paragraphs 2.d and 9 of the Agreement the "greatest possible interpretation:" 'Use' "shall mean and include, but not be limited to, copy, edit, modify, prepare derivative works, reproduce, transmit, display, broadcast, print, publish, use in connection with any media (including, but not limited to, advertising, packaging, promotional and collateral materials), and store in a database."[8]

---

[6] Tr. at 710:23-711:10.

[7] J-002, ¶¶ 2(c), 9 .

[8] J-002, ¶ 2(d).

Paragraphs 2 and 9 of the 2006 License Agreement worked in tandem to grant Sylvania the right to Use—and authorize Use of—all of PIC's images, past and future. Specifically, Paragraph 2.c defined "Images" as "Past Images" and "Future Images."[9] J-2 The Agreement's definition of "Images" did not distinguish between PIC images sent for "approval" purposes or in "final" form.[10] PIC, however, understood and the parties on the surface operated on the understanding that low resolution Images without copyright attribution would be sent to Sylvania for approval only and then returned to PIC for preparation of Final high resolution Images usually with copyright notice/attribution. Para 4.b-c  The Final Images were understood by PIC to be used by Sylvania in marketing its products. Sylvania, however, has recently acknowledged using approval Images, without copyright attribution, for marketing and promoting its products. The evidence established such approval Images were stored in Sylvania's Digital Asset Management System (the"DAM") from which  Trade Service retrieved PIC Images for distribution to the Respondent Distributors to spread to the internet.

Relying on the very broad language of paragraphs 2 and 9 of the Agreement, Sylvania allowed its customers Use the PIC images without the need of written authorization.[11] While PIC contends Sylvania was required to employ written sub-licenses, there is no such requirement in the Agreement, a matter conceded by Mr. Picone.[12]Tr. 717  The language in Paragraph 9 and the acknowledgement by PIC and its counsel that the Images could be and were intended to be

---

[9] J-002, ¶ 2(d).

[10] Tr. at 714:16-715:16, 551:4-20; *see also* J-002, ¶¶ 2, 9.

[11] *See* Tr. at 717:3-21; J-002, ¶ 9.

[12] Tr. at 717:3-21; J-002, ¶ 9.

Used by Sylvania's customers provides the basis for an implied license from Sylvania for such customer use of the Images. J-220

Two other obligations of Sylvania under the Agreement are matters of controversy,  the "Fee Provision" in Paragraph 9 and the "Attribution Provision" in Paragraph 10.b.[13]

The Fee Provision provides that "[n]otwithstanding the foregoing, [Sylvania] may not sub-license Images in exchange for valuable consideration such as a fee (*e.g.,* as stock photography)."[14] By that language PIC simply wanted to insure that Sylvania would not use paragraph 9 to license the PIC Images for a fee in competition with PIC. J-220 Paragraph 9 did not intend to prohibit the arrangement Sylvania had with Trade Service or IDEA, and it did not prohibit the arrangement Trade Service had with its distributors.  None of those arrangements was akin to stock photography sales. On the other hand, the right to provide the PIC Images to Trade Service and Sylvania customers under Paragraph 9 of the Agreement did not relieve Sylvania of its obligations under 10.b to insure the PIC copyright notice/attribution was included with the all of the PIC Images whether used by Sylvania, its distributors or others, regardless of medium.  Yet, as the evidence clearly demonstrated, Sylvania had no policies or procedures in place to insure that the PIC Images used by the distributors and customers contained the required attribution.  Nor did Sylvania monitor the distributors' Use of the PIC Images. The contractual obligations of 10.b did not carry over to Trade Service and the distributors, but the contractual obligations of Sylvania under 10.b extended to the Use of the PIC Images by Trade Service, IDEA and the Respondent Distributors.

---

[13] J-002, ¶¶ 9, 10(b).

[14] J-002, ¶ 9.

The attribution provisions of Para 10.b provide that

> [t]o the extent reasonably possible and practical, OSI shall, as may be reasonable and practical with respect to size, prominence, aesthetics, and Use, include a copyright notice indicating PIC as the copyright owner and/or include proper attribution indicating Paul Picone as the photographer for Images Used by OSI.

This equivocal open ended language (reasonably possible and practical) in Par 10.b is not the certain emphatic language of a condition to Sylvania's Use of the Images that would give rise to a claim for copyright infringement, especially when read against the backdrop of the parties' negotiations and the very broad scope of the Use license in paragraphs 2.d and 9. The terms of 10.b, however, very clearly imposed contractual obligations on Sylvania, which it blithely ignored when it came to internet Use of the Images by its customers. While Sylvania argued that the obligation to insure PIC's copyright notice/attribution on its Images lay with PIC, there is no such obligation in the Agreement. I believe Sylvania now concedes that point.

The Agreement further provides in Para 10.b:

> i.  OSI shall have no obligation to include such copyright notice and/or attribution for Images appearing on packaging, point of purchase displays or the like;

> ii.  OSI shall include such copyright notice and/or attribution on Images framed for display.

> iii.  OSI shall include such copyright notice and/or attribution as a footnote or end note for Images appearing in materials such as annual reports; and

> iv.  OSI shall include such copyright notice and/or attribution as a side note or footnote for Images appearing in published advertisements.

These examples further support Sylvania's contention that Para 10.b did not impose a condition on its Use of the PIC Images. The first example describes the circumstances of infringement under the License that gave rise to the Agreement.

16

Sylvania was not going to risk having to recall products for copyright infringement.  The other three represent circumstances in which it would have been easy and normal for Sylvania to comply and it apparently did. Unmentioned was internet Use which became an issue for both parties as the internet grew in importance and use, but the expansion of internet Use did not convert the provisions of Para 10.b into conditions.

 PIC argues that this Notice-or-Attribution language in Paragraph 10.b is a condition of the Agreement, a condition that is common. Absent such a condition, PIC contends a photographer would consider and most likely charge a higher license fee, because he or she would not be getting the advertising and promotion that would come with the exploitation of the image. When Images are distributed with a logo or name on them, people see them, leading to the photographer possibly being hired. 4230:18-4231:1 (Sedlik). The language in 10.b, however, was not a condition, but a covenant that OSI was required to satisfy and which, if performed as promised, would have provided the same advertising and promotional value as a condition.  If that contractual obligation were breached, and here it was, then the photographer, PIC, would be entitled to damages equal at least to what it would have required to relinquish that exploitation in the Agreement.   And there is evidence in the record that PIC was open to higher royalty/photography fees to relinquish its copyrights and the attribution obligation. Tr. 151:5-22 (Picone); see OSI-452  Had PIC required  conditional terms as it had in the License with Sylvania, it was incumbent upon PIC to insure they were there.  Again, there were two parties to the negotiation, and Sylvania was not of a mind to create any copyright conditions in the Agreement. Yet, the parties found a way to provide attribution to PIC without creating an unacceptable condition to Sylvania's Use of the Images.   Indeed, Para 10.a also provided promotional value to PIC by naming Picone and PIC Sylvania's Photographer of Record.

The key dispute before me in this proceeding boils down to the issue of whether Sylvania violated the Fee and Attribution Provisions of Para 9 and 10.b and, if so, the legal effect of any such violations.

PIC contends that Paragraph 9 of the Agreement imposed a condition to Sylvania's Use of the PIC Images, the breach of which would give rise to copyright infringement. Paragraph 9 grants: "OSI a non-exclusive, worldwide license in and to all the Images thereto to freely Use, sub-license Use, and permit Use, in its sole and absolute discretion, in perpetuity, anywhere in the world." Para 2.d provides: "'Use' shall mean and include, but not be limited to, copy, edit, modify, prepare derivative works, reproduce, transmit, display, broadcast, print, publish, use in connection with any media (including, but limited to advertising, packaging, promotional and collateral materials), and store in a database. 'Use' shall, for the purposes of this Agreement, be given the greatest possible interpretation." This was a very broad license indeed.

The only limitation on Sylvania's Use was that Sylvania could not license or sub-license the Use of the Images for a fee. Specifically, PIC was concerned about the possibility that Sylvania might use paragraph 9 to compete with PIC in the licensing of Images and used the example of stock photography. Stock photography refers to the business in which agencies acquire inventories of Images from photographers which they then license for a fee. Getty Images, gettyimages.com, is one of the better known stock photography businesses. Sylvania, however, did not license the Images for a fee and, in fact, did not charge for their Use by Trade Service or the Respondent Distributors. Rather Sylvania freely allowed Trade Service and the distributors to Use the PIC Images to market and sell Sylvania products. It would have made no sense for Sylvania to charge them a fee for Using the PIC Images. Those fee provisions of Paragraph 9 also did not carry over to Trade Service or the distributors; nothing in paragraph 9

suggests otherwise.  In any event, Trade Service which provided the PIC Images to the distributors and others as part of a subscription service was not acting as a seller of stock photography; it was distributing the PIC Images as part of the effort to sell Sylvania lighting products, an activity that Sylvania had negotiated for and that PIC and its counsel had anticipated and approved.  Again, Picone acknowledged that a purpose of the 2006 License Agreement had been to "allow Sylvania to allow its own customers to help promote products in some way, and to use those images in any way they could."[15] See J-220; Tr. 1729 (Colotti)

Thus, the actions of Sylvania and of Trade Service under paragraph 9 did not violate conditions of the Agreement.  On the other hand, Sylvania's failure to insure that Trade Service and the Third Party Respondents provided PIC's copyright notice and/or attribution on the PIC Images they received from Sylvania, primarily through the DAM, and distributed on the internet without attribution to PIC did violate the terms of Paragraph 10.b.  In doing so, Sylvania breached the terms of the Agreement and is liable to PIC for contract damages.

## PIC IMAGES ON THE INTERNET

PIC has 2,630 registered copyrights for images it took for OSI (the "PIC Images").  Ex. P-370; 106:1-12 (Picone).  PIC provided ample support for its claim that Sylvania provided the PIC Images without copyright notice or attribution to Trade Service and the Third Party Respondents.

---

[15] Tr. at 710:23-711:10.

There was evidence of vast numbers of PIC Images on the internet sites of the customers and

distributors of Sylvania and of Trade Service.  Although much of PIC's evidence was offered in

support of its copyright claims, that same evidence supports PIC's claims for breach of Para

10.b.  Exhibit PIC-452 is a summary of voluminous records that PIC submitted which provides

the following information for each of the infringed images: (1) the "source image" number; (2)

the copyright registration number; (3) the registration exhibit number where the copyright

registration is located; (4) image exhibit number which shows a copy of the image; (5) the

filename for the image; (6) the bates number for the image reflecting its infringing use; (7) the

effective date for the image; and (8) the publication date for the image. *See* Ex. PIC-452, 4074:6-

4075:5 (Cruciani).

### Infringement Report

The extent of the Use of the PIC Images without copyright notice/attribution on the

internet was massive and was documented in the infringement report created by Len Bucchino.

Prior to the infringement report that Bucchino prepared, Picone had begun identifying PIC

Images without attribution through Google searches and identifying examples based upon the

search results.

Picone reviewed thousands of cut sheets or PIBs of his images. 260:20-24 (Picone).

Picone had captured a number of screenshots showing OSI using PIC Images without copyright

notices. 248:1-249:17, 250:24-251:11, 252:16-253:6, 254:17-255:16 (Picone); Ex. J-16 (Exhibit

AB to Amended Counterclaim attaching 20 separate examples where OSI used a PIC Image

without a copyright notice). See also Ex. J-190, 264:13-19; Ex. J-191, 265:4-14; and Ex. J-200;

266:11-267:10 (Picone).

Picone was involved in the Infringement Report in several ways. Picone's screenshot captures of no attribution were incorporated into Bucchino's Infringement Report. 326:5-10 (Picone). With respect to all the publications that were loaded into the Infringement Report, Picone "examined everything" and compared each image to Picone's master copy. 327:17-328:2 (Picone). He matched every image on each publication that was used in the Infringement Report to confirm whether the Image was or was not a PIC Image. 331:10-332:7 (Picone).

Picone was also involved in confirming the output or the results of the Infringement Report. He reviewed PIC-140A, which is a visual depiction of each of the 2,630 source images that are PIC's copyrighted images of OSI product shots and application shots. Picone confirmed that each of the 2,630 images that was used as source images in the Infringement Report, in fact, was his copyrighted image. 332:12-334:3 (Picone).

There are hundreds of pages from the Capital website, as captured in Exhibit E to PIC's complaint against Capital, PIC-578, that embody PIC Images without a visible watermark. 3361:10-3363:1 (Paradiso).

There are hundreds of pages from the Brook website, as captured in Exhibit E to PIC's complaint against Brook, PIC-579, that embody PIC Images without a visible watermark. 3363:2-3364:2 (Paradiso).

There are pages from the Irby website, as captured in Exhibit E to PIC's complaint against Irby, PIC-580, that embody PIC Images without a visible watermark. 3364:15-3365:5 (Paradiso).

Len Bucchino prepared and sponsored PIC's "Infringement Report." Bucchino builds software platforms for a living. 908:13-14 (Bucchino). He has extensive experience in software development, having been continually employed in the field since graduating with a bachelor's

21

degree in computer science from Drexel University in 2000. 910:24-924:20 (Bucchino). Bucchino is currently the Vice President of Engineering for ResearchNow, a marketing research supplier; in his current position, he is the head of a team of about 20 people and is responsible for ResearchNow's software platforms. 921:18-924:20 (Bucchino).

PIC engaged Bucchino as a consultant in this arbitration. He performed his work in this matter during evenings and weekends, independently of his regular employment. Bucchino is being compensated at a rate of $500 per hour and, at the time of his direct examination, had spent approximately 500 hours in connection with this arbitration. 925:8-23; 934:12-935:8 (Bucchino).

The Infringement Report contains, among other things, individualized data with a line item for every "infringing use" (i.e., PIC internet Image without copyright attribution), that Bucchino identified, along with additional data about those uses. 937:7-15; 938:10-16 (Bucchino); PIC-0115. For the purpose of the Infringement Report and Bucchino's testimony related thereto, "Infringing use" or "infringing image" refers to a use of a PIC Image identified with no copyright notice and/or attribution on or near the PIC Image. 951:23-952:2 (Bucchino).

Bucchino used three types of source for identifying the infringing uses documented in the Infringement report: (1) reverse image search engines (Tineye and Incandescent); (2) images and documents produced in this arbitration; and (3) Bucchino's custom "web scraping" application. 964:2-966:3 (Bucchino).

There are multiple image-recognition providers, and they are quite accurate. Professor Sedlik has found Tineye to be the most accurate image-recognition service available anywhere. 4152:9-20 (Sedlik).

As to the first source, Tineye and Incandescent are companies that offer reverse image search engine services. These services maintain databases of billions of images that the

companies have identified on the internet. Tineye's marketing materials, for example, indicate that Tineye's database contains about four billion images. A user of these search engines submits an image to the search engine, which the search engine compares to the images in its database. If the search engine identifies a match, it records a "hit," and if no matches are identified, it records a "miss," 966:4-969:3; 970:14-973:10; 978:21-980:4 (Bucchino). Bucchino conducted "positive" and "negative" testing to ensure the accuracy of these functionalities in the course of preparing the Infringement Report. 1107:15-1108:17 (Bucchino). Tineye and Incandescent have "a very high level of accuracy, in being able to identify [Picone's] source images," 1113:24-1114:17 (Bucchino).

Bucchino developed a software program that permitted him to submit images to the reverse image search engines and capture the raw data output in an automated fashion. 967:23-968:15 (Bucchino). Using this software program, Bucchino submitted PIC's library of 2,630 PIC Images to the search engines for comparison against their databases. 966:4-969:3; 970:14-973:10; 978:21-980:4 (Bucchino). The library of 2,630 PIC Images consists of the set of PIC Images of OSI products registered with the United States Copyright Office; the unique image identification numbers were assigned by the lawyer who registered the images on PIC's behalf. 1219:3-21 (Bucchino). When Bucchino received the output from these search engines, "hits" went into the Infringement Report, whereas "misses" did not. 966:4-969:3; 970:14-973:10; 978:21-980:4 (Bucchino).

For the second source of infringing uses, images and documents produced in this arbitration, Bucchino also employed a Tineye product, but a different one from its reverse image search. Bucchino created a custom Tineye database of the 2,630 PIC Images and then submitted various materials produced in this arbitration to Tineye to determine whether any images in those

materials matched the PIC Images in the custom database. Again, matches went into the Infringement Report, while misses did not. 980:5-981:24 (Bucchino).

The third source of infringing uses, the custom web scraping application, also employed the Tineye product involving the custom database of the 2,630 PIC Images. The purpose of this application is to identify infringing uses on the internet that are not part of the Tineye or Incandescent databases. A website is submitted to the application, and the application "crawls" the website to identify images on the website that match any in the custom database of 2,630 PIC Images. The output from the web scraping application looks similar to the output from the other Tineye products; matches went into the Infringement Report, misses did not. 982:1-987:13(Bucchino).

A single infringing use may be identified multiple times by the three sources of infringing uses. For example, a single PIC Image on a particular webpage may be part of Tineye's database, and thus be identified by the Tineye reverse image search, but that same PIC Image on the same webpage may also be identified by the custom web scraping application. In such case, although the infringing use was identified twice, it goes into the Infringement Report only once as a result of "de-duping," 938-17:939:14; 983:80-17 (Bucchino).

The final Infringement Report offered as evidence in this arbitration is the result of an iterative process, because not all hits in the raw data output of the three sources described above were, in fact, "Infringing uses." As part of the quality-control process, two main categories of items were removed from the Infringement Report. First, a hit may be an image that is very similar to one of the 2,630 PIC Images but is not, in fact, a PIC Image. Second, because the source applications identified matching images whether or not they included a notice and/or

attribution, a hit may, in fact, have been used with PIC's notice and/or attribution on or near the image. 979:16-980:4; 1025:23-1027:23; 1078:6-20 (Bucchino).

To remove false hits from the Infringement Report, Bucchino submitted draft reports to John Drossos and PIC's counsel. A team overseen by Picone and including Drossos and certain of PIC's attorneys then reviewed the report and identified items that needed to be removed. Id. An item would be removed if, for example, it included a notice and/or attribution. Id. The review team considered not only whether the notice and/or attribution appeared on the infringing image, itself, but if the image was included as part of a multi-page document, the review team considered whether an appropriate credit was included anywhere in the document. 1214:8-1217:6 (Bucchino). Bucchino personally reviewed a small number of items in draft reports, particularly early in the process. 1079:13-1080:7l; 1084:19-22; 1095:18-1097:11 (Bucchino). Following the reviews, Bucchino was provided with the unique identifiers of hits, which Bucchino removed from the subsequent iteration. 979:16-980:4; 1025:23-1027:23; 1078:6-20 (Bucchino).

In the final Infringement Report, the core data is reflected in the "ConsolidatedAppData" tab. That tab contains 19,000-plus line items, one for each specific infringing use that Bucchino identified by any of the eight Defendants or by any of the 58 Nonparty Distributors in issue in this case. 938:10-16; 1037:18-1039:23 (Bucchino); Ex. PIC-0115; PIC-0115C. Each row represents an infringing use. 945:21-4 (Bucchino). Thus, each represents a breach by OSI of its obligation in 10.b of the Agreement to include the PIC copyright notice or attribution on or with the PIC Images.

The ConsolidatedAppData tab contains several relevant columns. The first column, "Infringement ID," is a unique identifier assigned to each infringing use. Thus, although a

particular PIC Image may be infringed many times by many different entities, each infringing use is assigned a unique Infringement ID. As part of the iterative quality-control process, Infringement IDs were used to identify items that should be removed from the Infringement Report. 946:8-24 (Bucchino); Ex. PIC-0115; PIC-0115C.

"Source ID" is the unique identifier assigned to each infringed PIC Image. Thus, each Source ID corresponds to one of the allegedly infringed PIC Images in this arbitration, as set forth in PIC-0140A. 947:1-5 (Bucchino).

"Infringing Item" is the location of the PIC Image in issue, whether found on the internet or otherwise. For Infringing Items on the internet, the Infringing Item column identifies the URL (i.e., link) to the webpage on which the PIC Image is or was displayed. For other, non-internet-based Infringing Items, such as those in the document production in this arbitration, the Infringing Item column identifies the file name, file path, and/or Bates number for the document containing the infringement. 947:6-948:16 (Bucchino).

"Infringement Type" describes the type or nature of the infringing use. There are five different classification reflected in the Infringement Type column of the ConsolidatedAppData tab: (1) "Hosted_Image"; (2) "Ref_Page"; (3) "Hosted_PDF"; (4) "Offline_PDF"; and (5) "Other," 948:7-949:18; 952:11-954:6 (Bucchino); PIC-0115; PIC-0115A; PIC-0115C.

Hosted_Image refers to "hosted images," which are single images on a server accessible on the internet at a URL. Ref_Page refers to "referencing pages," which are standard webpages that may include text, links to other webpages, and images. Hosted_PDF refers to a "hosted PDF," which is not a webpage, but is a PDF document available for download on the internet at a URL. For example, a technical bulletin related to a lighting product that is available for download from a lighting distributor's website would be a hosted PDF. "Offline_PDF" refers to

PDF documents other than those available for download on the internet, such as PDF documents produced in this arbitration. "Other" refer to all other types of infringing uses of the PIC Images. Id.; 949:2-18; 1006:6-1009:9; 1017:16-1024:23 (Bucchino).

"Domain" is the website on which web-based infringements are located. A domain differs from a URL in that a URL includes both a domain and a path within that domain to a specific webpage displaying an image. Domain is just the first portion of a URL. 956:11-957:9 (Bucchino).

"Entity" is the entity that engaged in the infringing use; for example, for web-based infringements, Entity identifies the entity that owns the domain on which the infringing image is displayed. 957:10-13 (Bucchino).

"Related Information" is any additional evidentiary information about the Infringing Item (for example, if the same infringing image was identified both by the Tineye reverse image search engine and in the document production in this arbitration, then the Additional Information column would contain information related to where the item is found in the document production). 957:14-958:2 (Bucchino).

The remaining tabs in the Infringement Report, other than the ConsolidatedAppData tab, are all Excel "pivot tables" that summarize the underlying data in different ways to make it easier to understand. 939:15-940:2; 1015:8-22 (Bucchino); PIC-0115; PIC-0115A; PIC-0115B; PIC-0115D; PIC-0115E; PIC-0115F. All Bucchino's pivot tables were driven from the ConsolidatedAppData tab. 3159:20-24 (Bucchino). Of particular importance to this arbitration is the tab entitled "Ryan's PT." 1049:1-1052:1; 1067:7-24 (Bucchino); PIC-0115; PIC-0115F. Ryan's PT shows "Distinct Source Image Infringements by Entity Detail." Id. That is, Ryan's PT shows each PIC Image infringed by each entity by Infringement Type. Id. But if a particular

entity infringes the same PIC Image by the same Infringement Type multiple times (for example, the same entity has multiple referencing pages on its website that display the infringing image), Ryan's PT counts that as only one referencing page infringement. Id. Bucchino worked with John Drossos to prepare this pivot table for Dr. Ryan Sullivan, who testified to PIC's damages. Id.

In addition to the Excel Infringement Report, Bucchino prepared an additional report referred to as the "Side-by-Side PDF Report." Bucchino personally prepared this entire document himself. 963:14-16 (Bucchino). The Side-by-Side PDF Report contains a visual depiction of each infringing image (i.e., each individual line item) in the ConsolidatedAppData tab of the Excel Infringement Report. 940:11-942:4 (Bucchino); PIC-140. The Side-by-Side PDF Report would permit anyone to review each line item and verify that the actual item found on the internet or elsewhere matches the PIC Image that it allegedly infringes. 1205:15-1206:13 (Bucchino).

The first column of the Side-by-Side PDF Report, "Source Image ID #," is the unique identifier assigned to each infringed PIC Image; it corresponds to the "Source ID" column in the Infringement Report. The second column of the Side-by-Side PDF Report, "Source Image," is the original copyrighted PIC Image, which Bucchino obtained from Picone. The third column of the Side-by-Side PDF Report, "Infringing Image," is a visual depiction of the actual infringing item as it was identified by Bucchino. In each instance, the image in the "Infringing Image" column lacks a copyright notice and/or attribution. The fourth column of the Side-by-Side PDF Report, "Infringement ID #," is the unique identifier assigned to each infringing use; it corresponds to the "Infringement ID" column in the Infringement Report. The "Evidentiary Information" column contains red text and, in some cases, black text under the red text. The red

text identifies the location of the PIC Image in issue and corresponds to the "Infringing Item" column of the Infringement Report; the black text, if any, identifies additional evidentiary information about the infringing image and corresponds to the "Additional Information" column in the Infringement Report. 1161:20-1164:7 (Bucchino); PIC-140.

Bucchino derived the "Infringing Images" from four different sources. The first is "live links." Live links are instances in which Bucchino captured a screenshot of the infringing image live on the internet at the time the final Side-by-Side PDF Report was generated, because the infringing item was still accessible on the internet. 989:2-990:8; 3175:21-3177:14 (Bucchino).

The second source of "Infringing Images" is "server responses." Because infringing images started coming down off the internet, Bucchino developed a process that would make a request to the hosting server for each webpage displaying an infringing image, and then would capture and record all the information that the server returned, including the image. Thus, Bucchino captured the exact image displayed on the webpage at the time the request was made. For most web-based infringing uses that were no longer live on the internet at the time the final Side-by-Side PDF Report was generated, the Side-by-Side PDF Report contains a captured image from the server response. 990:18-994:4; 1157:21-1158:6; 3175:21-3177:14 (Bucchino); see PIC-573 (containing server response backup files).

The third source of "Infringing Images" is "extracts from document production." Extracts from document production were used for infringements identified in the document production in this arbitration. In those instances, Bucchino clipped the exact image identified as infringing in the document production and included that image in the Side-by-Side PDF Report. 994:6-995:17; 3175:21-3177:14 (Bucchino).

The fourth source of "Infringing Images" is the "Tineye Archive." The Tineye Archive was used for infringements identified using Tineye's reverse image search engine. For each image in Tineye's database, it records a copy of the image, and so an image available on the internet at the time Tineye found it remains available in Tineye's archive even if the image has since been removed from the webpage on which it was found. 995:18-996:20; 3175:21-3177:14 (Bucchino).

If Bucchino was not able to include a visual depiction of the actual infringing item in the Side-by-Side PDF Report (because, in the case of a web-based infringement, the image had been removed from the webpage since Bucchino originally identified it, but Bucchino had not captured a server response including the image, and the image also was not recorded in Tineye's archive), the infringing item was removed from the Infringement Report altogether. 1206:19-1207:14 (Bucchino).

In addition to the Infringement Report and the Side-by-Side PDF Report, which document instances of infringing images (i.e., PIC Images used without a copyright notice and/or attribution), Bucchino created a "Non-Infringement Report," which documents instances of PIC Images used with a copyright notice and/or attribution. 1052:5-15 (Bucchino); PIC-0117; PIC-117A; PIC-117B.

As well as sponsoring his various reports, Bucchino provided rebuttal testimony to the testimony and report of Todd Dietrich, a forensic expert with BDO, who testified on behalf of OSI and provided a report purporting to identify instances of infringing images in Bucchino's Infringement Report that are not live on the internet. Dietrich's testimony and report did not undermine the validity of Bucchino's testimony and reports. During his rebuttal testimony, Bucchino confirmed that, even if an image were no longer live on the internet, his report

documented the infringing image when it was live on the internet and captured a visual depiction

of the actual infringing image through one or more sources. 3146:16-3148:8; 3169:3-3172:7;

3174:13-3175:13; 3177:23-3179:11 (Bucchino). Bucchino's Side-by-Side PDF Report (which

depicts every infringing image in the Excel Infringement Report) includes a visual depiction and

associated evidence for every infringing image identified by Dietrich as not being live on the

internet. 3179:21-3184:22 (Bucchino).

### Relevance of Infringement Report to Contract Claims

The infringement report originally was intended by PIC to support its copyright claims

and less so for the breach of contract claims.  It is so comprehensive, it may seem like overkill

when dealing with the contract claims, but the report documented at least 19,000 separate PIC

Images on the internet without copyright notice or attribution.  That number translates into a

substantially larger number of actual Image shots when one  considers there are multiple shots of

many of the Images.  Duplicate instances were consolidated into a single event which is how the

number was *reduced* to 19,000.  I have included the details of the infringement report and the

work of Mr. Bucchino because they document so well the breadth of the internet Use for the PIC

Images by Sylvania and its customers without the copyright notices/attributions called for in

Para 10.b of the Agreement.  Sylvania's conduct in not controlling the spread and Use of the

Images without attribution was a breach of the Agreement.

I find that Bucchino was eminently qualified to design the software that he employed in

the investigation and analysis that resulted in the Infringement Report, as well as the Side-by-

Side PDF Report.

I find that Bucchino's testimony with regard to the process that resulted in his reports,

including the Infringement Report and the Side-by-Side PDF Report, was forthright and credible.

I find that Bucchino employed a painstaking and rigorous process to document the vast uses of PIC Images that are in issue in this arbitration.

I find that Defendants have not offered credible, material evidence, through cross-examination or otherwise, challenging or otherwise casting doubt upon Bucchino's Infringement Report or the processes he used to generate it.

Based on the foregoing, and in light of the record as a whole, I find that the Infringement Report accurately and reliably documents thousands of instances in which the PIC Images were used without notice and/or attribution and also accurately and reliably documents the additional information included in the report, including information related to the nature and location of the use and the entity that engaged in the use. In other words, I find that Sylvania permitted the Third Party Respondents and the Nonparty customers to use the PIC Images without notice and/or attribution in violation of 10.b as reported in the Infringement Report.


## REASONABLY POSSIBLE AND PRACTICAL


Pursuant to Para 10.b of the Agreement, PIC was obligated to include copyright notice/attribution with all PIC Images (except those in Para 10.b.i) to the extent it was reasonably possible and practical, an obligation for which Sylvania has the burden of proof.  To make that determination is it helpful to review the process whereby PIC Images were obtained and processed for Use by Sylvania.

PIC was to provide OSI with camera-ready, post production images and was not required to provide raw images. Para 4.b  A camera-ready image is the final, definitive image to which there would be no further changes. PIC understood and the parties operated with the

understanding that Sylvania would only be using camera-ready images.  J-2, Par 4.b,; J-167;

Tr139:24-141:5 (Picone).  It is worth noting as well that there was absolutely no obligation under

the Agreement for PIC to provide the copyright notice/attribution on the PIC Images it submitted

to Sylvania.  While there is much evidence that PIC in fact did quite often provide its Images

with the copyright notice embedded in the Image or arranged to have the copyright

notice/attribution available to include with its Images, the obligation to insure such placement

was on Sylvania under paragraph 10.b.  Although the language of 10.b does not impose

conditions on Sylvania that can give rise to copyright infringement, that language is clear in its

requirement that Sylvania provide the attribution to PIC that it bargained for and expected.  Had

Sylvania not wanted that obligation, it was clear that PIC was willing to convey its copyrights to

Sylvania under the Agreement for additional financial consideration.  Tr.151:5-22 (Picone)

There was a two-step process in connection with the delivery of images from PIC to OSI.

*See* Ex. P-547. The first step was the approval process in which PIC would get the product,

photograph it, and send the image to OSI for approval. *See* Ex. P-22. Typically, approval images

were lower-resolution JPEG images that would be sent by email to OSI, most often with the

images embedded within the email. Approval images would not have copyright notices on them,

which notices would not be applied until PIC produced the final images 187:13-21, 189:15-

190:12, 192:1-8, 473:4-20 (Picone); 1857:18-1858:4, 1947:11-1948:1 (Champagne).

To obtain and use a PIC Image, for example, a Sylvania employee such as Constance

Maass would provide PIC with a product sample and brief PIC on how to shoot the product,

what the etch should look like, etc. 1372:6-1373:18 (Maas). PIC would then provide a low-res

"approval" image via email. *Id*. The approval image was "usually" provided without a copyright

notice and/or attribution "because you might want to change it." *Id*. Approval images "should not

go onto the product, onto the packaging or … sales documentation, like product information bulletins." *Id.*

PIC provided images to OSI in various resolution levels. A TIFF file is the highest level of resolution. A JPEG is typically used in a lower resolution format. A GIFF file is a very small, thumbnail size that would be used only on the Internet. 141:21-143:6 (Picone).

PIC produced and delivered the PIC Images to OSI with the assistance of Nathaniel Sands. Sands started working for Picone in 2010 on a full time basis until the end of 2012. 598:18-599:5 (Sands). Sands worked somewhere between 500 and 1,000 of Picone's images. 599:24-600:3 (Sands).

For PIC and Picone, Sands performed page layouts, scanning, and with respect to digital images, performed retouching, silhouetting, cleaning up and placing them on backgrounds. Sands also worked on the images used for two years of Lightfair, large projects at an annual industry trade show, where all of OSI products are placed into a page layout program and incorporated into a brochure. 599:6-22 (Sands).

The second step in the delivery of the PIC Images would result in the delivery of the final, camera-ready image from PIC to OSI. 192:9-15 (Picone); 1712:6-12 (Colotti). The image would typically be transmitted by FTP or CD. 192:16-20 (Picone). Picone's "standard practice" was to provide final images to OSI with the copyright notice on the image. 473:21-474:5 (Picone); Exs. J-171, J-181, J-18; J-173 (1945:8-14, Champagne).

PIC would deliver final images to OSI primarily by an FTP server or on CDs. The more images included in a given transmission, the more likely it would be made by CD. 143:3-7, 147:18-20 (Picone). Typically, the CDs of the final images were delivered to Champagne while the images that were sent by FTP would be pulled down by whoever at OSI was requesting the

Image or from one of the people working on creating the print materials. 1885:11-1886:13 (Champagne).

After Maass approved an Image, PIC would deliver the high-res final image with the notice and/or attribution and the appropriate background, either via FTP or on a CD. 1372:6-1374:4 (Maass). Final shots were the shots actually going onto product literature and into the DAM. *Id.*.

Sands recognized 99 percent of the Images in Exhibit PIC-371A as images that Sands worked on and finalized. 614:20-615:19 (Sands). All but one of the images in Exhibit PIC 371A have the visible PIC logo on them. Only PICARB0049490 does not have the logo. Other than that one Image, all of the other Images in Exhibit PIC371A should also have the Digimarc watermark utilized by PIC. 615:20-616:12 (Sands).

Even when PIC would deliver multiple images in batch form on CDs, such as images PIC took of the Sylvania 300, PIC's practice was to include a credit line that was imprinted onto the CD surface itself. Ex. J-179; 206:16-208:11 (Picone).

Around 2009, OSI launched its Digital Asset Management system, or "DAM." 2138:16-21 (Wilson). Ultimately, because Trade Service obtained most of its PIC Images from the DAM, it was Sylvania's failure to properly manage the input and output of the DAM that allowed the wholesale distribution of PIC Images on the internet without copyright notices.

Foote migrated the images in Sylvania's  FileNet system (an earlier database) to the DAM system. His task had been to migrate and apply metatags to 15,000 images in 90 days, and he had no assistance. There was a large volume of duplicate images, which duplicates were then imported into the DAM. For example, there might be 15 or 20 copies of the same image, and Foote explained that the images were loaded into FileNet, and then the DAM, in a very random

and haphazard manner, which resulted in much duplication. 2282:8-20, 2283:21-2285:3, 2344:2-2344:22 (Foote).

The DAM system would automatically upload PIC's high-resolution TIFF image, make a copy of that to a lower-resolution JPEG format and then pull the lower-resolution JPEG image into the website to build the webpage. 2146:4-11, 2147:11-15, 2148:11-15, 2149:22-2150:16 (Wilson). This automated copying process would result in at least three or four copies of the same image in varying sizes. 2193:13-2194:10 (Wilson).

Wilson, who was in charge of the DAM, did not know whether the automated copying process of the high-resolution image to the low-resolution image did or did not change any of the metadata associated with the image. The DAM User Guide did give specific instructions regarding how to alter an image's metadata. 2156:24-2157:5, 2200:11-13 (Wilson); Ex. J-197.0023.

There was a different process for dealing with PIC Images to be used in print publications. For print publications, the product managers would deal directly with Champagne and they would get the images from Champagne and not the DAM. 2159:18-2160:4 (Wilson)

Over time, potentially hundreds of people would have loaded PIC Images into the DAM, which could have included product managers, marketing managers, and human resources personnel. For example, a product manager would load the PIC Image into the system and then Rick Wilson's group would build a web page for the product manager. 2119:7-2120:17, 2125:11-16 (Wilson).  OSI, however, had no systems in place to monitor usage of the DAM, including whenever someone would access an image in the DAM or make any changes or modifications to the images. 2419:23-2420:6 (Wilson).

OSI witnesses testified that it was their understanding that PIC was only required to provide camera-ready images and that only camera-ready images would be loaded into the DAM. The idea was that the DAM would serve as a central repository that product managers or other OSI employees would use to retrieve final, approved images. By contrast, it was not the intent that people would store images locally on their hard drives or share directories. 1709:18-21, 1711:15-24 (Colotti); 1860:21-1861:20, 1863:9-15 (Champagne).

DAM access was not limited to OSI employees, however, but included OSI customers. OSI imposed no terms or conditions upon its customers' access to the PIC Images in the DAM. 2381:7-2383:9 (Wilson). Nor critically did OSI impose any conditions on its customers' Use of the Images after the Images had been retrieved from the DAM.

OSI employees were supposed to put only final PIC Images into the DAM. 1379:20-1380:1 (Maas). After reviewing a re-creation of OSI's Digital Asset Management database, Prof. Sedlik, PIC's photographic expert, concluded that approval Images and final Images were co-mingled in the DAM. Further, there were no restrictions listed in the DAM, although they should have been included for proper control of the PIC Images. 4270:15-4272:19 (Sedlik). OSI had no further need for approval images once PIC sent the final Images, yet Champagne, OSI's Director of Marketing and Communications from 2008-12, did not have a regular practice of deleting approval images. Champagne had no explanation why OSI produced thousands of approval images as part of its document production in this case. 1887:9-16, 1887:21-1888:5 (Champagne). Sylvania disclosed in its pre-hearing brief that it had used approval Images on the internet.

In fact, OSI failed to maintain centralized control over the Images stored in the DAM and multiple people had access to the DAM. And even though the intent was that OSI customers would only receive PIC Images from the DAM, the system was not designed that way; for

example, there was nothing to prevent an OSI employee from sending a PIC Image to a customer directly from his local drive. 1862:5-10, 1864:8-24. (Champagne). In fact, the DAM User Guide provided instructions to OSI employees on how to save images locally. Ex. J-197.

Separate and independent from the PIC Images stored in the DAM, the marketing group had separate file folders where they could save PIC Images on their shared system. Wilson had no idea how many PIC Images had been saved locally in these separate folders. 2401:7-19 (Wilson).

Foote was one of the people responsible for loading PIC Images into the DAM and filling out the metatag fields. Foote likened himself to a librarian, which required him to know what was in the library, *i.e.*, the DAM. But because the protocols were not always followed by the product managers, he often was unable to locate photographs that were supposed to be in the DAM. 2271:12-2272:4, 2272:13-2274:22 (Foote). The various business units within OSI would check the PIC Images into the DAM and do their own posting on the Internet. J-161.0001.

Often, there would be multiple images of the same product within the DAM; one product shot might have the copyright notice on it and another might not. OSI had no system in place that would insure that Trade Service or IDEA would to pull an Image with the copyright notice rather than the one without the notice. 2132:16-2133:9, 2134:20-24 (Wilson)

The training provided to users of the DAM system also was minimal. The training consisted of nothing more than asking the DAM users to watch a video and see how a picture was uploaded. The only follow up was to ask the OSI employees if they had viewed the video and accept their word for it. 2418:15:-22 (Wilson).

When loading an image into the DAM, there were e 40 to 50 metatag fields related to the image. Only a few of these fields were required to be filled out, however, and few were. Wilson

was the decision-maker as to which fields were required fields. 2121:15-24, 2122:13-15, 2185:17-2186:4 (Wilson).

OSI failed to properly log the PIC Images into its DAM. In a January 4, 2010, email, Marianne Shin wrote that "*1000's of images have already been uploaded into the system currently, but there was not time or resources available to do all the tagging prior, so it is very difficult to locate images. For example, most Paul Picone images have not been tagged as such, so the search engine in the program cannot locate them*." Ex. P-312.

A further example of OSI's failure to properly log the PIC images is a Sylvania prepared Excel spreadsheet dated March 23, 2010, from Wilson to Champagne showing all the "current metatags" for all the images in the DAM system. Ex. J-162. The spreadsheet contains a column K for "owner" and column L for "photographer." For the vast majority of images, these two columns are labeled "unknown" instead of identifying PIC as the owner and Picone as the photographer of the PIC Images. *Id.*; 216:1-217:2 (Picone); 2209:17-2213:15 (Wilson). But, Wilson confirmed that there would have been thousands of PIC Images in the DAM as of March 2010. He had no explanation why as of March 2010, nearly four years into the contract, Picone had thousands of his images loaded into the DAM, but only a handful identified Picone as the photographer. 2229:9-14, 2231:14-2232:4 (Wilson).

Foote received a copy of this spreadsheet, and it reflects the metatag fields that he had previously attempted to fill out when the FileNet system was migrated to the DAM system. Foote confirmed that the vast majority of entries under Column L for "photographer" were filled out as "unknown" because Foote believed that it was better to identify the photographer as "unknown" than to potentially assign the credit to the wrong photographer. Ex. J-162, Ex. PIC-319, 2351:21-2353:1 (Foote).

As noted above, Para 10.b imposed obligations on PIC's use of the Images by requiring OSI use a PIC copyright notice or attribution on all PIC Images if reasonably possible or practical. Sylvania, however, had mislabeled or mischaracterized the "restrictions" field in the DAM system as it related to the PIC images. With respect to the "restrictions" field, Wilson was unaware of the circumstances in which the PIC copyright notice was required to be used at the time the DAM became operational in 2009 and did not learn of these restrictions until 2012 or 2013. Because Wilson was unaware of the copyright notice requirement, he had no reason to think to address the copyright-notice issue in the "restricted" field. 2175:2-22 (Wilson).

If a product manager wanted to use a PIC Image that was in the DAM, there was nothing to inform her that the Image might need to be used with a copyright notice and that she might need to do further due diligence before Using the Image. 2234:14-2235:3 (Wilson).

Exhibit PIC-334 is an October 2013 OSI email chain that includes Wilson and reflects a different type of mislabeling of PIC Images. This email exchange relates to an OSI publication that was using certain images, but OSI did not know which ones, if any, were PIC Images. Thus, the decision was made to apply a credit that said "certain photography by Paul Picone." As Wilson acknowledged, that may have resulted in attributing certain images to Picone when, in fact, they may not have been his images. Ex. PIC-334; 2246:10-2249:7 (Wilson).

In August 30, 2010, Wilson made an internal request for OSI to authorize OSI's Process Council to prioritize an IT project that would make certain optional metatag fields be required fields. "In the DAM system, need to make the usage rights fields, Credits, Owner, Restrictions, required fields." Wilson, as the requester, could assign different priority levels to the IT request, but he never elevated this request to a top priority. Ex. PIC-371.0002; 2235:12-2241:19 (Wilson)

As of August 2014, after litigation had begun, OSI undertook an effort to segregate the PIC Images from the other images that were in the DAM. Exhibit OSI-255 is an Excel spreadsheet that reflects how the metatag fields were filled out as of August 2014 for what OSI believed were the PIC Images. There were 6,968 images contained in the August 2014 spreadsheet. 2224:23-2226:1, 2227:4-2228:4 (Wilson).

But OSI's efforts in August 2014 to segregate the PIC Images were unsuccessful. PIC images were still live on the SAN (storage area network) at least as of September 2015. 2561:2-2562:8, 2562:22-2563:13 (Wilson); Ex. PIC-357.[16] OSI's inability to identify and segregate the PIC Images is directly traceable to its failure to label them when they first were uploaded to the DAM. Ex. PIC-355; 2565:3-2568:3 (Wilson).

OSI ultimately was responsible to supervise how the PIC Images got used by the distributors, because OSI provided the PIC Images to Trade Service which in turn provided them to the distributors. OSI understood that Trade Service would distribute the PIC Images to its distributors in the same form as it had received them from OSI. 1750:1-13, 1754:8-17 (Colotti); *see also* Molitor Depo. 71:25:23 (IDEA witness explaining that manufacturers like OSI control their data, including images, by being able to add a link, change a link, or remove a link).

OSI had the means to monitor its customers' use of the PIC Images and to enforce compliance, including by automated means or by a third party service. 4274:24-4276:2 (Sedlik). Once OSI was notified in 2011 that it there was an issue with respect to PIC Images being distributed by OSI without PIC's visible watermarks and that it was violating the Attribution Provisions of Para 10.b, it should have taken immediate steps to ensure that attribution was properly provided on the PIC Images that it distributed. 4277:23-4278:16; 4279:12-16 (Sedlik).

---

[16] Technically, the images are stored in the SAN, not the DAM. The SAN is the cheaper storage area within the DAM where the images physically reside. 2579:11-2582:15 (Wilson).

Yet, OSI never notified any of its customers of the Agreement's copyright-notice restrictions, even though Colotti acknowledged that it would have been logical to have done so. Colotti had no explanation why, for example, he never instructed Champagne to communicate the copyright-notice restrictions to OSI's customers. 1740:21-1741:6, 1742:23-1743:11, 1744:18-24, 1745:12-17 (Colotti).  Indeed, Champagne testified that if there was a PIC Image in the DAM without copyright notice/attribution it was sent to Trade Service and IDEA and to the customers that way.  To her mind, OSI could not control customer Use.  Tr. 1990-91 OSI never conveyed to IDEA that there were any restrictions on the use of its images. Molitor Depo. 50:17-51:9. As a result of OSI's failure to notify customers and distributors, Colotti agreed that it would be possible that an OSI customer could receive a PIC Image with a copyright notice, remove the notice, and think that would be fine.

During the six-year term of the Agreement, OSI had no policies in place to ensure that its customers were using the PIC Images with the copyright notice. *After* the contract had expired and PIC had begun to complain about its Images without copyright notice, Champagne drafted "Do's and Don'ts" regarding the proper use of the PIC Images. Ex. PIC-55; Ex. J-157; 1910:12-1911:8 (Champagne). OSI only used the "Do's and Don'ts" internally, however,  and never shared them with OSI customers. This failure to notify OSI's customers was deliberate. Colotti was asked whether in hindsight he would agree that it would have been a good idea to have informed OSI's customers of the "Do's and Don'ts." Colotti answered, "***Not really. Because we didn't want to limit the customers' ability to use our images to sell our products.***" 1747:7-23 (Colotti). OSI chose not to inform its customers of the copyright-notice limitations, because OSI was concerned that to do so would have limited their customers' sales of OSI products.   That notice requirement, however,  was a right that PIC had bargained for and OSI had agreed to

42

provide.  Champagne testified she did not think it was her job as head of marketing communications to insure Images had the attribution and that if it was important to Picone he should have made sure he included it with the Image.  Tr. 1979  The contractual obligation, however, was not PIC's, although as demonstrated above it almost always included the copyright notice, which suggests either OSI removed PIC's CMI or used approval Images for the internet because they were easier to manage and the resolution for internet Images would not be significant.  The contract obligation was that of Sylvania, and the mere fact that OSI thought notifying its customers of this requirement could limit their sales of OSI products shows OSI placed its own financial interests above PIC's bargained for rights.

Yet, despite the explicit language of the Agreement's attribution provisions in Paragraph 10.b, there was no corporate policy and no program in place to insure that the PIC Images were assigned their proper usage rights upon being loaded in the DAM, from which  Trade Service and IDEA retrieved their many PIC Images for distribution. Although Colotti had suffered through many months of litigation threats and negations with PIC over the Agreement, as VP head of marketing and communications he did virtually nothing to insure that systems were in place to include the PIC copyright notice on PIC Images, which became a serious issue as the internet grew.


It is clear to me that when dealing with the PIC Images, which in fact were an essential part of Sylvania's marketing activities, Sylvania was aware and attempted to include the PIC copyrights with PIC Images on print media and the examples in Par 10.b.ii-iv.  What is equally clear is the Sylvania was not diligent about how to deal with PIC Images when distributed to Trade Service and the Third Party Respondents and in internet Use in general.  The vast number

of PIC Images without attribution on the internet came from the Third Party Defendants and the customers of Trade Service, but there was a sizable number from Sylvania as well, although Syvania in some instances would reflect the PIC attribution in the terms on Sylvania's web site. That was not done by the Third Party Respondents because there was no care by Sylvania in insuring that all PIC Images in the DAM had a copyright notice, in insuring that those taking PIC Images out of the DAM knew they were to include PIC attribution on PIC's Images and insuring that the third Party Respondents and Wilson who managed the DAM were aware of the attribution provisions. Sylvania just ignored the issue or thought it was too difficult or was not important. Colotti and Champagne both testified to that effect.

Sylvania, however, asserts that it was not "reasonably possible or practical" for it to have included the copyright notice/attribution with the PIC Images on the internet. Certainly as Champagne explained her approach to implementing Para 10.b, based on Colotti having explained it to her when she became Director of Marcom, it would not be reasonably possible and practical to include attribution if it were inconvenient or there was a business reason to ignore it, e.g. distributors and sales people were difficult to manage and control. As explained below, I find that PIC has met its burden of showing that it was reasonably possible and practical for PIC's copyright notice to be included on all PIC Images that are the subject of this action, whether the Images were used in print publications or on the Internet. For any of the PIC Images used without a copyright notice, OSI has failed to show that it was not reasonably possible or practical to have  included the copyright notice/attribution on those PIC Images.

Notably, under Para10.b, it was Sylvania's obligation  to insure the copyright notice was included with the Images when it used them. Picone showed himself willing at times to accommodate Sylvania if the copyright notice was an impediment to Use of the Image (Lowe's)

or to agree to other ways to provide the copyright notice, e.g. include it among the terms on Sylvania's website or attach it to the outside of a CD of Images of the Sylvania 300 NASCAR Race. If the attribution issues for a particular Use were too complicated technically or more aesthetically sensitive than normal, then Sylvania might have been able to invoke the reasonably possible and practical language of Para 10.b. There is no evidence that was ever the case. Sylvania never offered any examples of that, and in fact the witnesses seemed uniform in their views attribution was possible.  Of course, had Sylvania been faced with continuing circumstances where attribution was not reasonably possible it was incumbent upon Sylvania to approach PIC and seek a mutually satisfactory solution.  It was not unilaterally to ignore the provisions of 10.b, especially to such a widespread  degree with internet Use.

In negotiating the Agreement, OSI never suggested that Picone had to deliver the PIC Images with a copyright notice in order for paragraph 10.b to apply. 1690:17-1691:15 (Colotti). Neither paragraph 10 nor any other provision of the Agreement imposes a requirement on PIC to supply OSI with Images containing a copyright notice. Rather, to the extent it was "reasonably possible and practical" to include a copyright notice, the obligation was that of OSI, and the language of 10.b gave OSI lots of latitude in working with PIC on the placement of the copyright notice.  When it came to internet Use by Trade Service and the distributors, however, OSI made no apparent effort to comply with 10.b. Ex. J-2, ¶ 10(b).

Champagne was the person responsible for implementing paragraph 10(b) of the Agreement, and she understood 10.b addressed how OSI was to Use the PIC Images, not how they would be received by OSI. 1916:17-22 (Champagne).  Yet even she testified that if inclusion of the copyright notice on the Images was important to Mr. Picone he should have included it. Tr. 1979

On occasion, OSI or its print vendors actually applied PIC's copyright notice to Images they had received from PIC without the notice, particularly for print publications such as the Booth Guide. 1695:9-1696:16 (Colotti). They had been provided the PIC copyright notice/attribution for inclusion with the Image by PIC and understood it was to be included with the Image.

OSI also had copies of PIC's signature or copyright notice on file. Foote also had, and used, the Photoshop software. Thus, if OSI received a PIC Image without a copyright notice, Foote could use the Photoshop software to add the PIC signature lines that OSI had on file to the PIC Image or next to it. It would only have taken Foote between 30 seconds and one minute to take the PIC credit line and put it either on or next to the PIC Image. 2286:2-2287:1, 2302:9-2303:2 (Foote). Notwithstanding the minimal effort involved, Champagne never instructed Foote to use Photoshop to add PIC's copyright notice on images that did not have the notice. 1985:13-22 (Champagne).

That it was reasonably possible and practical for OSI to use PIC's copyright notice in all circumstances is evidenced by the fact that, on a number of occasions, OSI did use PIC Images with copyright notices. See Ex. J-9 (Exhibit Y to Amended Counterclaim attaching 36 separate examples where OSI used a PIC Image with a copyright notice, which included the notice on product information bulletins, the Sylvania.com website, product catalogues, and news articles); 240:3-244:7 (Picone); 1659:4-1665:22 (Colotti). Professor Sedlik, PIC's  expert opined that it was both reasonable and practical for OSI to include the attribution in its marketing and web-based uses, based upon the many very similar instances where OSI had included the attribution under almost identical circumstances. 4260:17-4261:24 (Sedlik); PIC-119.

Likewise, there are a number of examples where third parties properly used the PIC Images with copyright notices. See Ex. J-10 (Exhibit Z to Amended Counterclaim attaching 8 separate examples where third parties used a PIC Image with a copyright notice); 244:22-246:8 (Picone).

Picone testified that he was not aware of any circumstance under which it was not reasonably possible and practical to use PIC's copyright notice on a PIC Image. 247:20-24 (Picone).

Champagne agreed that for print publications it was always reasonably possible and practical to include PIC's copyright notice. Thus, it would have been a mistake if the PIC copyright notice did not appear somewhere on a print publication. 1846:5-10, 1850:11-20 (Champagne).

Similarly, for internet-based publications, Champagne could not recall anyone ever telling her that it was not reasonably possible and practical to include PIC's copyright notice on or near the image. 1900:4-9, 1900:20-1901:4, 1920:24-1921:8 (Champagne).

Moreover, Champagne confirmed that even in those circumstances when the use of the copyright notice on the image in an online context created a problem with the image's aesthetics, it was easily solved by running the credit line vertically, instead of horizontally, and reducing the size. Ex. PIC-25; 1937:18-1939:12 (Champagne).

In determining whether a PIC Image should be used with the copyright notice, the only relevant question is whether it was reasonably possible and practical to do so. That is the question that OSI should have determined in connection with each use of a PIC Image, and. Champagne understood that the first question to ask pursuant to paragraph 10.b was whether it was reasonably possible and practical to include the copyright notice. 1894:22-1895:19

47

(Champagne). Champagne testified that even if the question to that answer was "yes," however she did not believe that it was mandatory despite the "shall" in paragraph 10.b. 1895:6:19 (Champagne).

Yet, OSI's witnesses testified that—rather than determining whether it was reasonably possible or practical to include a copyright notice—OSI used the PIC Images in the form in which they were received. If the image was received with a copyright notice, it was used with the notice; if it was received without a copyright, it was used without the notice. 1849:5-14, 1851:7-1852:7, 1856:12-21 (Champagne); 2126:9-2127:16 (Wilson). Wilson was in charge of the DAM, but he testified that it was not his group's responsibility to determine whether an image should or should not be used with PIC's copyright notice, that it was Champagne's responsibility. 2126:18-2127:4 (Wilson).

OSI's approach was contrary to the terms of paragraph 10.b of the Agreement. The test was not whether OSI received a PIC Image with a copyright notice; rather, the test was whether it was reasonably possible and practical for OSI to include the copyright notice with the Image. If it was reasonably possible and practical, then OSI was required to us the notice. J-2  I have found that it was reasonably possible and practical for OSI, to include a copyright notice on PIC Images in virtually all circumstances and their failure to do so was a clear breach of the Agreement by OSI. OSI offered no credible evidence to the contrary.  That so many PIC Images escaped OSI without a copyright notice was the result of poor management and the absence of adequate Image control and DAM procedures.

In its opening brief, OSI admitted that it had used approval images which would not have had copyright notices or attribution. See OSI Br. at 29 ("Thus, when OSI used PIC's approval images for internet applications, those images never bore copyright notices."). Prior to reading

this statement in OSI's brief, Picone had never before heard that OSI was using PIC's approval images for Internet applications. 472:15-18, 474:15-19 (Picone). Picone's understanding was that the approval images that he had emailed to OSI would be deleted and that they would never be used externally. 474:6-14 (Picone) Of course, even if OSI were using approval Images, that would not have altered OSI's obligation under the attribution provisions of the Agreement to include the PIC copyright notice/attribution on or near such approval Image. J-2, Paragraph 10.b

OSI never discussed with Picone that OSI intended to use approval images on the Internet. 1713:6-14 (Colotti). Approval images should never have been loaded into the DAM in the first place, but if a particular product had both approval and final images in the DAM, there was no way for Wilson's group to determine which was the final image. 2161:11-23 (Wilson).

OSI's admission that it used approval images for internet applications is directly contrary to the understanding of witnesses for both parties, who unanimously testified that only PIC's final, camera-ready images were to be used externally, either on the Internet or in publications. 1713:15-20, 1714:6-20, 1717:16-24 (Colotti); 1857:12-17 (Champagne). Wilson testified that "[f]inal images were supposed to be used. That was an agreement between Denise Champagne and the product managers." 2129:14-19 (Wilson).

OSI paid PIC for the extra work to get the image from the approval stage to the final, camera-ready stage, and the whole point of that was to make sure that OSI was using the final, camera-ready image. 1712:12-14 (Colotti); 1859:12-1860:5 (Champagne). Inasmuch as Final Images very likely had copyright attribution with it, Use of Final Images would have made complying with 10.b straightforward. Approval images were designed to be used only for internal purposes as part of the review process with Picone. 1867:17-20 (Champagne).

When shown this statement from OSI's opening brief, Champagne testified that she was surprised to see OSI's acknowledgement that it used PIC's approval images for internet applications. Champagne was not aware that OSI had used approval images for internet applications and she had never authorized such uses. Champagne, as the person charged with implementing the Agreement, intended to ensure that only final, camera-ready images were used by OSI and would not have authorized the use of approval images. 1868:10-19, 1874:4-14 (Champagne). Yet, OSI has acknowledge in its opening brief that it did use approval Images on the internet.

Thus, I find the Agreement did not impose conditions to Sylvania's Use of the Images under either para 9 or 10.b, but Para 10.b did create a contractual obligation for Sylvania to include PIC copyright notice or attribution with Images to the extent reasonably possible and practical and that included Use on the internet.  Sylvania failed to meet its obligations under Para 10.b.  It failed to establish it was not reasonably possible and practical to include the attribution and it did virtually nothing to prevent the wide spread Use of the PIC Images on the internet without attribution by the Third Party Respondents.

## COPYRIGHT AND DMCA CLAIMS

The parties do not dispute that the 2006 License Agreement is a valid and enforceable contract as between PIC and OSI.  They do, however, dispute the meaning of certain provisions of the Agreement. In particular, PIC contends that two key provisions allegedly violated by Defendants are conditions of the license rather than mere covenants, and so their violation gives rise to claims for copyright infringement rather than breach of contract: (1) the provision in ¶ 9

stating that "OSI may not sub-license Images in exchange for valuable consideration such as a fee (e.g., as stock photography)"; and (2) ¶ 10(b), which provides, "To the extent reasonably possible and practical, OSI shall, as may be reasonable and practical with respect to size, prominence, aesthetics, and Use, include a copyright notice indicating PIC as the copyright owner and/or include proper attribution indicating Paul Picone as the photographer for Images Used by OSI." Ex. J-2 ¶¶ 9, 10(b).  Sylvania, on the other hand, asserts that neither paragraph 9 nor 10.b imposed a condition on its Use of the PIC Images and it violated neither provision.

This complex case is based almost entirely on PIC's claim that Sylvania and Customer Respondents failed to credit PIC as the author of PIC's images despite having a legal obligation to do so.

The Copyright Act itself does not give copyright owners any rights of attribution (which are found in Section 106A) unless their works meet the statutory definition of "work[s] of visual art" in Section 101.  See 17 U.S.C. §§ 101, 106A.  PIC's images do not satisfy the Section 101 definition because those images neither "exist[ed] in a single copy . . . signed by the author," nor were they part of a "limited edition . . . signed and consecutively numbered."  Id.; see also id. § 101 (further defining "work of visual art" to exclude "any merchandising item or advertising, promotional, descriptive, covering, or packaging material or container").

Because the Copyright Act itself imposes no legal obligation on Sylvania or Customer Respondents to credit PIC as the author of PIC's images, PIC seeks to locate that obligation in the Agreement between Sylvania and PIC, which PIC uses as a vehicle for its copyright infringement claims.  PIC also seeks to hold Sylvania and Customer Respondents liable under the Digital Millennium Copyright Act (the "DMCA"). 17 U.S.C. Section 1202  I did not find,

however, that Sylvania or any of the Third Party Respondents had removed or altered CMI or did so knowing it would induce copyright infringement. As explained below, PIC cannot bring copyright claims based on its claims under the Agreement because those claims are cognizable only under contract law. PIC also cannot prove its claims under the DMCA. In short, this is a contract case, not a copyright case.

The single most important question in this dispute is whether this is a contract case or a copyright case, because in most respects, it cannot be both. See 3 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 10.15[A][4], at 10-122 (2016) ("Failing . . . rescission, . . . the grant continues in place, thus precluding infringement liability . . . . [T]he erstwhile grantor may nonetheless recover contract damages for breach of the covenant.").

Generally, a "copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement" and must sue for breach of contract instead. Graham v. James, 144 F.3d 229, 236 (2d Cir. 1998); see also Effects Associates, Inc. v. Cohen, 908 F.2d 555, 559 (9th Cir. 1990) (holding that the copyright claims were foreclosed in light of the nonexclusive license but observing that the copyright owner "retains the right to sue" for breach of contract).

On the other hand, if the license is limited in scope, and the licensee exceeds that scope, the copyright owner bring an action for copyright infringement. See S.O.S., Inc. v. Payday, Inc., 886 F.2d 1081, 1087 (9th Cir. 1989). Further, "[i]n cases where only the scope of the license is at issue, it is the copyright owner's burden to prove that defendant's usage was unauthorized." Spinelli v. Nat'l Football League, 96 F. Supp. 3d 81, 122 (S.D.N.Y. 2015).

"To recover for copyright infringement based on breach of a license agreement," the copyright owner must establish two elements: "(1) the copying must exceed the scope of the

defendant's license and (2) the copyright owner's complaint must be grounded on an exclusive

right of copyright (e.g., unlawful reproduction or distribution)."   MDY Indus., LLC v. Blizzard

Entm't, Inc., 629 F.3d 928, 940 (9th Cir. 2010), cited in Accusoft Corp. v. Quest Diagnostics,

Inc., No. 12-cv-40007-TSH, 2015 WL 10718481 (D. Mass. Oct. 1, 2015).   The first element

requires an analysis of the 2006 License Agreement, while the second element looks to the

nature of Sylvania's (and Sylvania's customers') alleged violations of that agreement.   See

Accusoft, 2015 WL 10718481, at *22 ("[T]he potential for infringement exists only where a

licensee's action exceeds the license's scope in a manner that implicates one of the licensor's

exclusive statutory rights.").

PIC did not establish either element here, and thus it cannot recover for copyright

infringement under any theory against Sylvania or the Third Party Respondents.

As to the first element, "[t]he critical question is not the existence but the scope of the

license" (S.O.S., 886 F.2d at 1087-88), which in turn depends upon whether the limitations at

issue are conditions or covenants.

Courts refer to "contractual terms that limit a license's scope as 'conditions,' the breach

of which constitute copyright infringement."   MDY Indus., 629 F.3d at 939. "[A]ll other license

terms [are] 'covenants,' the breach of which is actionable only under contract law."   Id.   AS I

have noted in my finding regarding the scope of the Agreement, it is difficult to imagine a

broader license than that extend to Sylvania under Para 2 and 9 of the Agreement.   The teams

themselves are expansive, "Use" was given the greatest possible interpretation and included all

manner of activity, including "copy, edit modify, prepare derivative works." Para 2.d The license

provision granted Sylvania a license to "Use," as defined, the PIC Images in its sole and absolute

discretion , in perpetuity , anywhere in the world."   There is little, if anything, Sylvania could

have done to exceed that scope, and that was Sylvania's intent in entering into the Agreement and agreeing to the consideration in the Agreement.  Moreover, I found no factual basis to conclude that Sylvania had exceeded the scope of the license, not by its conduct or that of the Third Party Respondents under Para 9 and not by Sylvania's conduct under Para 10.b.  Sylvania breached the terms of Para. 10.b but it did not exceed the scope of the license and therefore there is no copyright infringement.

Courts distinguish between conditions and covenants by applying state contract law "to the extent consistent with federal copyright law and policy."  MDY Indus., 629 F.3d at 939.

Under Massachusetts law, which governs the Agreement,[17] "[a] condition precedent defines an event which must occur before a contract becomes effective or before an obligation to perform arises under the contract.  If the condition is not fulfilled, the contract, or the obligations attached to the condition, may not be enforced."  Mass. Mun. Wholesale Elec. Co. v. Town of Danvers, 411 Mass. 39, 45, 577 N.E.2d 283, 288 (Mass. Sup. Jud. Ct. 1991).

As in other jurisdictions, "[e]mphatic words" of condition—such as "on condition that," "if and when," and "provided that"—"are generally considered necessary to create a condition precedent that will limit or forfeit rights under an agreement."  Id. at 56, 577 N.E.2d at 288 (citing cases); see Charles, Henry & Crowley Co. v. Home Ins. Co., 349 Mass. 723, 726, 212 N.E.2d 240, 242 (Mass. Sup. Jud. Ct. 1965) (requiring the precise words "condition precedent" or their equivalent); RESTATEMENT (SECOND) OF CONTRACTS § 226, comment a (2017) (noting "such words as 'on condition that,' 'provided that' and 'if' are often used for this purpose").Those emphatic words are not present in the Agreement.

---

[17] J-002, ¶ 47.

"In the absence of the usual words, a condition precedent may nonetheless be found to exist if the intent of the parties to create one is clearly manifested in the contract as a whole." Mass. Mun., 411 Mass. at 46, 577 N.E.2d at 288.

To determine the parties' intent, courts look first to the language of the contract itself; "only when a contract term is ambiguous" may courts "consider[ ] extrinsic evidence to discern intent," and when they do, any "[e]xtrinsic evidence of a condition precedent must indicate a clear intent which is expressly stated." Id. at 48 & n.5, 577 N.E.2d at 289 & n.5 (emphasis added).

"Wherever possible, equity construes ambiguous contract provisions as covenants rather than conditions." MDY Indus., 629 F.3d at 939; see Effects Assocs., 908 F.2d at 559 n.7 ("Conditions precedent are disfavored and will not be read into a contract unless required by plain, unambiguous language."); Restatement (Second) of Contracts § 227 (2017).

Applying these principles, courts have held that provisions requiring licensees to pay money or to provide attribution are covenants, not conditions. See Graham, 144 F.3d at 236 ("We think that the payment of royalties and the inclusion of a notice crediting James's authorship are to be considered covenants, not conditions."); Jacob Maxwell, Inc. v. Veeck, 110 F.3d 749, 754 (11th Cir. 1997) ("[W]e cannot say that JMI's permission to play was conditioned on . . . public recognition."); I.A.E., Inc. v. Shaver, 74 F.3d 768, 778 (7th Cir. 1996) ("[N]othing in the contract or in Mr. Shaver's later letter indicates that full payment was a condition precedent to the use of his drawings."). This makes perfect sense, as licensees usually pay money and provide attribution only after the copyright owner grants the license. See Graham, 144 F.3d at 237 ("contract obligations that are to be performed after partial performance by the other party are not treated as conditions") (citations omitted).

PIC relies on and quotes Accusoft Corp. v. Quest Diagnostics, Inc., 2015 WL 10718481, at *22 (D. Mass. Oct. 1, 2015), in which the court explained:

> Parties to a contract are, of course, free to impose whatever conditions they choose. To determine whether the parties intended to create a condition, a court considers the words used by the parties, the contract taken as a whole, and the surrounding facts and circumstances. Emphatic words are generally considered necessary to create a condition precedent that will limit or forfeit rights under an agreement.

I performed the analysis set out by the court in Accusoft and concluded there were no conditions imposed on Sylvania by the Agreement that gave rise to copyright infringement:

> In determining whether the provisions of Paragraphs 9 and 10.b of the Agreement created conditions to the licensed Use or merely covenants, it is important, as the court in Accusoft notes, to consider the words used, the contract as a whole, and the surrounding facts and circumstances.  When I do that, I unmistakably conclude that all of the factors to be considered point to Paragraphs 9 and 10.b as creating covenants, not conditions.  First, OSI entered the Agreement with one clear goal in mind, to put an end to litigation threats for copyright infringement that could impose serious harm to business operations.  OSI was facing the threat of litigation from PIC at the time of the Agreement and facing the possibility of having to remove packaging from stores.  That was an unacceptable scenario to Colotti, Hunt and OSI going forward.  Mr. Picone too was looking for a long term solution; he wanted an arrangement that would compensate him well for six years before he retired.  Although Mr. Picone cared about his copyrights, he was prepared to give them up to OSI in return for more consideration under the Agreement.  That was his testimony at the Arbitration and it resonated with me. Tr. 151
>
> Accordingly, in defining the Use in paragraph 2.d and in defining the license rights in paragraph 9, the parties, with the aid of experienced, capable intellectual property counsel who personally had been involved in the pre-Agreement litigation threats for copyright

infringement and tolling agreements, gave the "greatest possible interpretation" to the definition

of Use in the Agreement and  granted to OSI "in consideration of the [nonrefundable] royalty

payment …[of three million dollars] a non-exclusive worldwide license in and to all Images and

the copyrights thereto to freely Use, sub-license Use, and permit Use, in its sole and absolute

discretion, in perpetuity, anywhere in the world." It is difficult to imagine a license with a

broader scope than that in paragraphs 2.d and 9 or to imagine how OSI could act outside the

scope of those provisions. OSI could breach the Agreement, but it could not infringe PIC's

copyright.

        Paragraph 9 continues"[N]otwithstanding the foregoing, OSI may not sub-license

Images in exchange for…a fee (e.g., as stock photography)."  But, again, there was no evidence

Sylvania or any other party licensed the PIC Images in competition with PIC or in any way acted

as a provider of  stock photography.  Sylvania did not charge for the Images; Trade Service

simply included Images in a bundle of data.  And the evidence was that the fee provision dealt

only with Sylvania. There is nothing in these circumstances or this language in paragraphs 2.d

and 9 that conditions the license of the Images to Sylvania, other than perhaps the Royalty which

was paid and non-refundable. Both Mr. Picone and Mr Rader were very familiar with the clear

conditional language of the License between PIC and OSI.  Had PIC wanted a clear condition to

OSI's Use of the Images or its license to them, Mr. Rader knew how to draft such a condition.

And had he done so, OSI likely would have rejected the Agreement.  It did not intend to have its

rights to the Images made conditional.  Conditions are not in the Agreement because there would

have been no Agreement with conditions.

        The language of paragraph 10.b is not referenced or implicated in any way in

either Para 2.d or 9, and the license in Para 9 is not conditioned on the language or attribution

obligations of Sylvania.  While paragraph 9 prohibits OSI from licensing the Images for a fee,

Rader noted that PIC simply wanted to insure that OSI would not use the License to "compete"

with PIC by licensing its Images for a fee, as with stock photography.  J- 220   OSI was never in

competition with PIC by licensing the Images, and OSI violated neither the letter nor the spirit of

that prohibition, which was a covenant and not a condition.

     The purpose of the attribution language in paragraph 10.b and the

acknowledgement in 10.a of Mr. Picone as Sylvania's photographer of record were to insure that

Mr. Picone received recognition and publicity for his work without the need of creating a

condition to the Agreement.  Because the attribution provisions were not conditions under the

Agreement, Mr. PIcone  got a clear and unequivocal contractual obligation from OSI to provide

that recognition. It was a way to insure that he got that, and the obligation to include his

copyright or attribution on or near the PIC Images would insure that recognition.  It was not

necessary to make those obligations conditions to the Agreement to achieve that goal.  And while

his copyrights were important to him, Mr. Picone testified that he had been prepared to convey

them to OSI for additional consideration under the Agreement. Tr. 151

     Of course, the language in paragraph 10.b is hardly the stuff of emphatic words

sought by the courts in finding conditions: "[T]o the extent reasonably possible and practical,

OSI shall, as may be reasonable and practical with respect to size, prominence, aesthetics, and

Use, include a copyright notice…."  The language gives a lot of leeway to OSI and does not read

as a condition to the licensed Use.

     PIC points to the Heading for paragraph 10 "Service Conditions" as support for its

position, but paragraph 45 says Headings are for convenience and must defer to the text, which

here does not say or mean condition.  In fact the "Service Conditions" Heading actually applies to paragraph 10.a-n, all of which seem to deal with photographic "services" and do not condition the license to Use the Images in any way.

PIC also relies on paragraph 18 which provides PIC can sue third parties for copyright infringement.  PIC did retain the copyrights and paragraph 18 is consistent with that ownership, but no more..  I note that paragraph 18 does not provide PIC could sue OSI for copyright infringement, only third parties.  While the introductory clauses of the Agreement contain the word "conditions," there is nothing to tie that word to paragraphs 9 or 10.b except perhaps a condition in paragraph 9 that actually conditions the rights of PIC and not those of OSI.  But again, as important as these words are, the actions of the parties speak loudly against a finding of a condition.  Both PIC and OSI wanted a long term arrangement: a license (OSI) and a fee arrangement with recognition (PIC). They both got what they wanted.


## RUSH CHARGES


PIC also contends Sylvania breached the Agreement by failing to pay PIC Rush Charges it billed in 2010 and 2012.  Sylvania asserts that PIC waived the charges and in any event, PIC did not comply with the provisions in the Agreement for submitting professional fee charges and therefore is barred from recovery.

In January 2007, early in the life of the Agreement, Picone sent a detailed letter to OSI explaining the reason for rush charges under the Agreement and confirming that while PIC had in many instances exercised its discretion not to impose rush charges, that it could and would

continue to exercise its discretion to impose rush charges as appropriate. PIC-479; J-2, Ex. C
Picone sent the letter because OSI was resisting even the concept of paying rush charges,
although they clearly are anticipated and provided for in the Agreement. 373:23-374:6 (Picone);
J-2, Ex. C. In fact, many times over the life of the Agreement, Picone did exercise his discretion
by foregoing rush charges. 374:10-375:11 (Picone).

Lightfair is the annual trade show for the lighting industry that gives lighting
manufacturers like OSI the opportunity to showcase their "latest and greatest" products. Colotti
described it as the major event of the year.  Booth Guides are glossy publications that OSI would
hand out at the Lightfair promoting its products. PIC's images of the new OSI products were a
central feature of the Booth Guides, and the guides were an important marketing tool for OSI.
1613:16-1615:13, 1737:14-18 (Colotti); Ex. PIC-513, Ex. PIC-515.

Lightfair was the most intense time of year for Picone and for OSI's photographic needs ;
it involved a lot of people working very long hours. PIC's work in connection with images for
the Booth Guides was particularly intense and demanding and included photo shoots that went
nonstop for 18 hours. 210:6-212:2 (Picone); Ex. P-23.

By definition, Lightfair generated rush charges. It was OSI's intense demand for
photographic work during Lightfair that gave rise to the rush charges at issue for 2010 and 2012.
It would have been a problem for OSI if Picone had not provided those Images for OSI on a rush
basis. 1616:18-1617:6, 1764:1-18, 1765:2-9, 1788:8-10 (Colotti). On the other hand, Colotti was
under pressure from Sylvania's controller to cut expenses and photography was a big budget
number and a logical place for accounting to look to cut expenses. 1769:22-1730:4 (Colotti).

Picone would do the work as OSI requested and then would typically submit an invoice
within several weeks of project completion for the standard invoices. The rush charges would not

be included in the standard invoice. If rush charges were involved, there would be a subsequent discussion. 346:20-347:15 (Picone).

Exhibit C to the 2006 License Agreement contains a schedule for rush charges, which provides for rush charges up to 300 percent of PIC's standard rates for work done on less than 24 hours' notice. Exhibit C further provides "rush charges may be applied at PIC's discretion." Ex. J-2 (Ex. C). OSI understood and had agreed in the Agreement that rush charges were at PIC's complete discretion. 1758:2-13 (Colotti).

**Rush charges for the 2010 Lightfaire Booth Guide** The 2010 rush charges are reflected in Exhibit J-6. This invoice contains an August 9, 2010 date, which date would have been automatically generated by PIC's bookkeeping system. 348:5-6, 349:8-12, 353:14-20, 355:11-23 (Picone).

On July 7, 2010, Picone sent to Colotti the estimates for the base invoice amounts relating to his work for the 2010 Lightfair. In his email, Picone noted that the attached invoices did not include rush charges, but advised Colotti that rush charges were being calculated and were conservatively estimated to amount to an additional $190,000. Ex. PIC-367.0002. Colotti responded with an internal email that same day and stated:

"This PIC issue has again erupted & I totally refuse to pay these rush fees (which PIC is contractually allowed). I am very disappointed that we have allowed this fuse to be lit as we both know & 'love' this legal settlement. We only have 1 ½ years left & I cannot absorb these rush fees. I spoke to Paul approximately 30 minutes ago & he was off the wall." Ex. PIC-367.0001.

Colotti confirmed during his testimony that PIC was contractually entitled to be paid these rush charges. 1811:8-13 (Colotti). Colotti explained OSI's refusal to pay these 2010 rush charges, however, on the basis of a "gentlemen's agreement" that he says he reached with Picone. Colotti testified that the agreement was that Picone "would not exercise his right to give

61

us a rush charge." 1767:20-23, 1768:23-1769:4 (Colotti). Colotti conceded that Picone never told

him that Picone was waiving his right to impose rush charges and conceded that PIC continued at

all times to have the discretion to impose them. 1769:5-9, 1774:14-20 (Colotti). Colotti

acknowledged there is no email or any other document that supports the existence of the

gentlemen's agreement. 1771:23-1772:8, 1775:9-12 (Colotti).

Sylvania's pre-hearing brief characterizes this gentlemen's agreement as being a binding

oral agreement. "The extrinsic evidence demonstrates that the parties had an oral agreement

precluding PIC from submitting rush charges." Sylvania's  Pre-Hearing Br. at 34 (emphasis in

original). This argument is legally wrong. The Agreement requires that any modifications be in

writing, and there was no written signed amendment waiving PIC's right to rush charges. Ex. J-

2, ¶ 43 ("Agreement may not be modified or amended except by writing signed by an officer of

OSI and an officer or principal of PIC."); 180:21-23 (Picone). In addition,  Colotti disagreed with

OSI's characterization of an oral modification to the Agreement and testified that he was not

asking that the Agreement be modified and understood that any modifications had to be in

writing. 1773:13-1774:3 (Colotti).

Colotti did not respond to Picone's request to be paid rush charges for the 2010 Booth

Guide by writing Picone that such charges were inconsistent with their gentlemen's agreement.

1810:22-1811:3 (Colotti). Six days later, on July 13, Picone wrote to Colotti that he was

"inclined to invoice you for the rush charges described in my previous correspondence." Ex.

PIC-549. Picone also wrote that he had been "extremely benevolent" in his billing practices by

consistently exercising his discretion not to bill rush charges even though he was entitled to them

under the Agreement. Id. Colotti agreed that Picone, in fact, had been benevolent in refraining

from charging rush fees. 1814:2-12 (Colotti).

On August 9, 2010, Picone sent Colotti the estimates for the rush charges. In his email, Picone recounted a discussion between with Colotti earlier that day in which Picone advised that if it was Sylvania's "intention to deny payment for these or any other forthcoming estimates for RUSH/O.T. service provided" then PIC intended to "proceed with other remedies." Ex. PIC-550. Colotti understood this is to be an implicit threat of litigation. 1817:4-6 (Colotti).

On September 3, 2010, Mr. Rader, PIC's outside counsel, sent a letter to OSI's in-house counsel demanding that OSI pay the two outstanding invoices "in full and forthwith" and further wrote that "[p]rior to OSI's late payment of Invoice Nos. 7554 and 7561, Picone had notified Colotti in no uncertain terms that PIC's forbearance had ended and that the rush charges for at least these two invoices would be promptly calculated and applied." Ex. PIC-484.

After being shown this September 3, 2010, email, Colotti testified as follows:

Q: To the extent there was ever a gentlemen's agreement, is it fair to say that it was clearly communicated by this time that was over?

A:     That's what I understood reading this.

Q: And so if the gentlemen's agreement was over by September 3, 2010, it never did get resuscitated, did it?

A:     Well, based upon this document, no. 1818:21-1819:3 (Colotti)

If the September 3, 2010, email were not clear enough, Mr. Rader sent a 5-page letter, with a Rule 408 settlement correspondence caption, to OSI's in-house attorney, Ed Podszus, on January 11, 2011. Ex. J-269. This letter addressed various disputes between the parties, including OSI's failure to pay rush charges. Rader reviewed the past dealings between Picone and Colotti and wrote that "Picone notified Colotti that PIC's forbearance had ended and that rush charges for Job Nos. 7554 and 7561 [the 2010 Booth Guide rush charges] would promptly be calculated

and applied." Ex. J-269.0001 (referring to 7/7/10 Picone email, Ex. PIC-367.0002). Rader

concluded his letter by urging that OSI meet its business obligations as the option would be

"litigation or arbitration." Ex J-2.

I find that Colotti and Picone did not enter into a binding agreement excusing OSI from

paying the 2010 rush charges. They clearly discussed the possibility of PIC deferring the rush

charges because Colotti was being pressured by the Sylvania controller about PIC's photography

charges, which PIC was entitled to under the Agreement, including rush charges. Colotti did

acknowledge there was no written version of the gentlemen's agreement, so any deferral agreed

to was temporary, was oral  and was not enforceable under the Agreement. 1771:23-1772:8,

1775:9-12 (Colotti); PIC's emails dated July 13, 2010 (Ex. PIC-549), August 9 (Ex. PIC-550),

and September 3 (Ex. PIC-484). Colotti also acknowledged that no later than September 3, 2010

any such agreement by PIC to forebear seeking payment for rush charges was over. Ex. PIC-484;

1818:21-1819:3 (Colotti). Thus, the gentlemen's agreement described by Colotti did not satisfy

paragraph 43, which requires any modification of the Agreement to be in writing and signed by

the parties, and it is undisputed that no such written modification of PIC's right to seek rush

charges was ever executed by the parties.

**Rush charge for the 2012 Lightfaire Booth Guide**: Colotti testified that the alleged

gentlemen's agreement related solely to the rush charges for the 2010 Lightfair and did not

extend to any other rush charges. 1789:8-16 (Colotti). Picone subsequently invoiced OSI for rush

charges for the 2012 Lightfair, and had a phone conversation with Colotti in which he stated that

he expected to be paid. Colotti acknowledged that Picone (i) did the work on a rush basis, (ii)

had the discretion to charge OSI rush charges, (iii) did charge OSI rush charges, and (iv) never

told OSI that he would not seek to be paid the 2012 rush charges. 1789:21-1790:10, 1803:12-

1805:3 (Colotti); Ex. J-7. That ended with the following question and answer:

> Q: Okay. And as you sit here today, having kind of gone through this chronology,
> you still can't tell Bonn why these rush charges for 2012 weren't paid?

> A: No. If I could, I would.      1806:5-9 (Colotti).

As to the 2012 rush charges, Colotti's testimony makes clear that there is no credible

claim that OSI does not owe these rush charges. Colotti acknowledged that no gentlemen's

agreement existed for the 2012 rush charges, and he had no explanation why OSI failed to pay

these rush charges.


## TORTIOUS INTERFERENCE


PIC also has asserted a claim against Sylvania for tortious interference with a potential

business opportunity Picone and PIC had in 2008 with Osram Licht AG (OG), Sylvania's

German parent company.  It is undisputed that PIC did Design Services work for Sylvania and

Sylvania and PIC entered into an Amendment to the Agreement dated September 30, 2008 that

extended the Agreement to September 30, 2012 . J-19  The Amendment further formalized the

terms for Sylvania to engage PIC to provide "packaging and marketing collateral material design

services ("Design Services")" as Sylvania requested.  As with his photography, Picone was good

at the  design work as well.  He did an assignment for OG, finished it quite timely and well.  OG

was impressed and requested Picone come to Germany and interview for the possibility of doing

additional design work. PIC had been assisted in this work by Maass and Jon DiGesu, both of

whom were involved with design work and both of whom spoke German which was an asset

when dealing with OG.

DiGesu, however, was in the midst of taking early retirement from Sylvania and that package included a non-compete.  When Geoff Hunt,  Senior VP with Sylvania and Colotti's boss, learned that Picone and DiGesu were planning to travel to Germany to interview for the OG design work, he advised Colotti to kill it. OSI-339; Tr.1430-33 (Maass) It is not clear whether Hunt made that decision because he did not want DiGesu who was retiring to show up at Sylvania doing Sylvania related work as a consultant, which could upset other people who also were retiring early but were not being allowed to serve as consultants, or whether Hunt did not think it would be in the best interests of  OSI and OG to expand their relations with Picone who Hunt probably thought had been a thorn in Sylvania's side regarding PIC's copyright infringement claims a couple of years earlier. Perhaps it was the combination of the two.

In any event, DiGesu got the message and bowed out. Picone went to Germany on his own.  The OG representatives (Zwerner) wrote that DiGesu was not important to the meeting and they would proceed with just Picone.  OSI-339  OG eventually did not select PIC for the work. Sylvania says OG found someone cheaper.  PIC did continue to do design work, however, for OG and for Sylvania through the next year.

These events occurred in 2008 and would generally be barred by the statute of limitations, which in Massachusetts is three years for torts.  M.G.L. c.260 sec. 2A  PIC asserts it just recently learned of the Hunt involvement during discovery and therefore, the statute of limitations was tolled.  The email correspondence to Picone and  the testimony of Maass, however, indicate Picone was notified of Hunt's attitude and involvement at the time; Maass shared an email with Picone in November 2008, which discloses Hunt's position.  OSI-339; Tr. 1430-33 (Maass) Even if the statute of limitations did not bar this claim, however, the facts and the law do not support the claim.  Hunt and Colotti were officers of Sylvania and had a duty and

privilege to communicate with their parent corporation and share their views on a business

matter. Absent serious malice, and there is no evidence of that, PIC has no claim.  Hunt was

allowed to act in what he thought was the best interest of Sylvania and OG, and while he may not

have personally liked Picone there is no evidence Hunt was acting without a business basis.As a

fact finder, I did not find sufficient evidence that OSI improperly interfered with PIC's

opportunities at OG and find that PIC's claims are barred by the statute of limitations

.

## FAILURE TO PRESERVE EVIDENCE

Both parties seek sanctions for failure by the other to preserve electronic/digital/

photographic evidence.  First, I find that PIC generally did preserve its evidence.  While there

were a lot of adventures with Picone's computers, in the final analysis nothing seems to have

been lost or altered.  Sylvania is suspicious about "modifications"  that show up in certain PIC

Image data as observed by Mr. Pate, Sylvania's forensic expert.  Pate testified a lot about best

practices and making forensic copies of materials at the earliest possible date when in litigation

or at any other time when that might be important.  Mr. Adams, the forensic expert for PIC, did

not disagree.  PIC produced its database, the Western Digital Drive ("WDD"), which it had used

to store the original Images it had provided to Sylvania under the Agreement.  PIC also produced

the Seagate drive to which it had transferred data from the WDD and produced the FTP server

which PIC had used to forward Images to Sylvania.  Others had "touched" various files on these

devices at various times; PIC's lawyers had copied files; Image files had been moved to the

Seagate drive; and Pate testified that his analysis of the PIC Image data files he was provided

showed that some had been "modified," but he could not on cross examination identify any

actual changes to any Image files.  I was satisfied that Pate had observed modifications as he saw them but that there, in fact, were no changes to any files, just Pate's suspicion. Adams confirmed that and said his analysis had shown no actual changes to the files.  Cross examination of Pate further confirmed that as did the testimony of Professor Sedlik. So I see no reason to sanction PIC.  While a lot of the discovery of data files was done late in discovery, I am aware of no prejudice to Sylvania by reason of these claims against PIC and deny Sylvania's request for sanctions.

Similarly, I deny PIC's request for sanctions.  I think PIC's request has more merit.  For one thing, Sylvania was slow and less than complete in instituting ligation holds; it was unable to account for or produce the many CDs PIC had sent containing its Final Images; Sylvania did not preserve its FTP server; Mitchell's laptop was destroyed; and other materials might have been saved and produced had the holds gone into effect with more people earlier than they did.  But in the final analysis, in light of my rulings on PIC's claims, I see no prejudice to PIC as a result of Sylvania's actions or failure to act.   More information from Sylvania would not have changed the outcome of this Arbitration. I therefore deny PIC's motion for sanctions as well.

## PIC'S DAMAGES

I have found that Sylvania has breached the Agreement in two respects. It improperly failed to pay the Rush Charges and it failed to comply with the attribution provisions of the Agreement.  Accordingly I award damages to PIC for both claims.  Because I do not find Sylvania infringed the copyrights of PIC I am not awarding copyright damages or damages under DMCA.  While there was evidence that there were Images on the internet and in the DAM

without PIC's copyright notification/attribution, there was no evidence to establish Sylvania

removed PIC CMI with the intent to provide false CMI or intentionally removed CMI knowing it

would "induce, enable, facilitate, or conceal any infringement." 17 U.S.C.sec. 1202 (b).  There is

evidence that CMI might have been removed as a result of cropping Images but none to coverup

or induce infringement.  I have found no copyright infringement, and it follows that there is no

violation of DMCA.


## CONTRACT DAMAGES FOR BREACH OF ATTRIBUTION


Dr. Ryan Sullivan is an economist and CEO of Intensity Corporation. 3572:3-7

(Sullivan). Dr. Sullivan holds a Bachelor's, Master's, and Ph.D. in economics from the

University of California at San Diego. 3573:5-9 (Sullivan). Dr. Sullivan has approximately 25

years' worth of professional experience in economic research. 3573:10-3574:9 (Sullivan).

During that time, Dr. Sullivan has done a great deal of work related to valuation of intangible

assets, including copyrights. 3574:17-3576:22 (Sullivan). Dr. Sullivan's work has included

analyzing and testifying regarding the fair-market value of copyrights. Id. While ultimately Dr.

Sullivan's testimony regarding copyrights has not been used determine damages for copyright

infringement, his testimony and the underlying evidence on which he relies has assisted me

generally in thinking about how to determine damages for breach of the attribution provisions in

10.b of the Agreement.  The issue is what would compensate PIC for the failure of OSI to have

provided the promotion and attribution benefits that PIC bargained for and was entitled to under

Para 10.b, but was not provided by Sylvania.

Dr. Sullivan calculated the fair-market value of use of each infringed PIC Image. Fair-market value is a fair and reasonable value that a willing buyer and willing seller would agree upon. Dr. Sullivan included three components in his fair-market value calculation for the infringed PIC Images: (1) a flat royalty per image; (2) the a amount that OSI actually paid for each image; (3) and a factor to account for the value of attribution. 3609:21-3611:12 (Sullivan).

His starting point in determining the fair market value of the use of each PIC Image was the Agreement. That agreement, Dr. Sullivan reasoned, is an unusually good benchmark because it involves OSI and PIC— the actual copyright owner and one of the actual infringers. 3613:6-3614:24 (Sullivan). Moreover, it involves the very same images as Dr. Sullivan was attempting to value during the same period as is relevant to this arbitration. Id.

Although the 2006 License Agreement resolves some disputes between PIC and OSI, it included a separate, $50,000 "release" payment to cover past disputes. Id. The other pricing under the agreement, in contrast, was forward-looking pricing related to an ongoing relationship between PIC and OSI. Id. OSI chose to continue using PIC's services on an arms'-length basis. Id. Therefore, that the Agreement was entered into in part to resolve past disputes does not negatively impact its value as a "comparable" or "benchmark" license in determining the fair-market value of the infringing uses. Id. In determining damages attributable to OSI's breach of 10.b rather than for copyright infringement, this analysis is instructive.

The first component of Dr. Sullivan's fair-market value calculation is a flat royalty per image. This amount represents a pro rata share of the $3 million royalty payment from OSI to PIC under the 2006 License Agreement based on the 2,630 past and future copyrighted PIC Images that PIC provided to OSI. 3611:15-3612:9 (Sullivan). Dr. Sullivan obtained the image count from Picone. Id. The resulting flat royalty per image is $1,140.

The second component of Dr. Sullivan's fair-market value calculation is the invoice amount for the image. 3598:13-3600:12; 3615:1-3619:8 (Sullivan). Dr. Sullivan derived per-image invoice amounts from the Invoice Map provided by Picone. Id.; PIC-0113. The Invoice Map calculates a per-image invoice amounts by prorating the total amount of the invoice or invoices for each image by the number of "final" shots covered by the invoice or invoices. Id.; see J-260 (collection of invoices).

The invoice price that OSI paid PIC for each image is a proper component of a "comparable" or "benchmark" license. Id. The invoices are designated by a "License/Invoice Number" and contain a "Description of Services and Rights Licensed." Id. Moreover, although the description of services contained in certain invoices includes items like travel and food, those items are properly included in a comparable license fee because they represent part of the amount that OSI actually had to pay for the ability to use the image. Id. Finally, the invoices provided on their face that rights to use the images were "licensed only upon full payment of total billing and subject to existing contractual agreements between licensor and client," which further confirms that the full invoice price is part of what OSI paid for a license to use the PIC Images. Id.   In light of the practice of PIC prior to the Agreement and the inclusion of photographic services in the negotiation of  the Agreement I find this analysis of Invoice charges an appropriate element in the consideration of damages.  Picone had advised OSI that it was usual to charge 300% of fees for services for an unlimited license for Images.  Picone was unique in his field and very well regarded, including by OSI. J-2, paragraph3.a; 23..  The parties eventually agreed on 180% of standard fees plus the $3 million royalty.  Thus, these Invoice charges were a factor to both parties in negotiating the Agreement and in settling on figures that would compensate PIC provided it received the appropriate attribution  called for under 10.b.

Because it did not receive that attribution, the inquiry is what would compensate PIC for that lack of attribution.

Dr. Sullivan next applied an adjustment to the invoice amount for each image to account for inflation from the invoice date to the present. 3621:22-3623:11 (Sullivan); PIC-0113; PIC-0231 (Sullivan Attachment F-10). The adjustment is intended to both reflect the economic reality of inflation and to comport with the 2006 License Agreement, which itself provides for an inflation adjustment over the contract term based on the consumer price index (the same metric as Dr. Sullivan used for his adjustment). Id.

Although Picone's image map computes invoice prices for 97 percent of the PIC Images in issue in this arbitration, invoices for a small number of PIC Images were unavailable. 3623:12-3624:8 (Sullivan). In these instances, Dr. Sullivan assigned the image the median invoice amount. Id. This was a reasonable and reliable means of estimating invoice amounts for instances in which the invoices were unavailable.

The median per-image base license fee, including both the flat royalty per image and the inflation-adjusted invoice amount, is $3,655; the average per-image base license fee $4,414. 3624:3625:1 (Sullivan).

The third component of Dr. Sullivan's fair-market value calculation is an attribution factor. 3625:2-3627:18 (Sullivan); PIC-0175 (Sullivan Attachment B-3). From an economic perspective, there is value associated with attribution. Id.

PIC's photography expert, Prof. Sedlik, agreed and testified that in calculating actual damages, to ascertain the fair market value of a license to use the PIC Images without attribution, it is necessary to multiply the total license fee by three to five times. This multiplier is not

punitive in nature. Instead, it serves to bring the base license fee up to the market value for the broader use of the images, without attribution. 4306:7-4307:23 (Sedlik).

Professor Sedlik proposed that a multiplier of 3 to 5 times the base license fee, when attribution is a condition of the license that is not fulfilled, would be appropriate to bring the license fee up to the level that the parties would have agreed to. 4317:19-23 (Sedlik). Thus, based on discussions with Professor Sedlik, Dr. Sullivan applied a multiplier of three to five to the base license fee because the base license fee assumes that the images would be used with a proper copyright notice and/or attribution, whereas all the infringing uses documented in the Infringement Report lacked notice and/or attribution. Id.

Defendants' own photography expert, Gary Elsner, actually corroborated this testimony. Elsner had previously submitted a declaration in the Barrera case in which he attempted to quantify damages relating to a defendant's use of copyrighted photographs that were used with no copyright credit and/or only a partial credit. See Ex. PIC-263. That case involved a single image, and Elsner calculated a base license fee of $9,000 and applied a three-times multiplier for a total of $27,000 for the failure to give the photographer proper credit on the image. The court accepted Elsner's testimony on this issue and awarded $27,000 in actual damages for the infringement of a single image. Ex. PIC-263; 3901:1-3904:7 (Elsner).

Elsner provided testimony in another case that involved someone who used a photograph without a copyright notice and that person subsequently became aware that the photograph was copyrighted. In that circumstance, Elsner's opinion was that the industry standard was a three or four time multiplier if the infringer settled short of litigation and a ten time multiplier if the copyright owner was forced to litigate to enforce his copyright. 3904:23-3905:16 (Elsner).  Each

of the Elsner matters has it own facts but the concept of a multiplier is accepted in damage calculations.

Using a multiplier of three, the median per-image fair-market value of use of the infringed PIC Images is $10,966; using a multiplier of five, the median per-image fair-market value of use of the infringed PIC Images is $18,722. Id.

To determine the total fair-market value of each Defendant's infringing uses, Dr. Sullivan calculated the fair-market value of the infringing uses by image and entity. 3627:19-3633:22 (Sullivan); PIC-0176 (Sullivan Attachment B-4). That is, Dr. Sullivan assigned one fair-market value license fee to each PIC Image infringed by a particular entity, regardless of how many time that entity infringed that PIC Image. Id.  Dr. Sullivan testified that the contract damages solely for OSI's breach of contract was $7,827,821.


I found this approach by Dr. Sullivan instructive, but ultimately I did not find that his analysis actually was designed to compensate PIC for the value of what it had been denied by Sylvania's failure to comply with its obligations under Para 10.b. Contract damages are intended to put the damaged party in the same position as performance would have.  In this case, that cannot occur, but it is possible to compensate PIC for the value of what Sylvania denied PIC by Sylvania's breach.  That measure of damages is to determine at what price PIC would have conveyed all of its copyrights to Sylvania and relinquished its rights to attribution.

Under the Agreement PIC received a royalty of $3 million and a total of $3.6 million for professional fees.  PIC may actually have generated more fees than $3.6 million but that was the amount agreed to.  As I have noted, Picone actually was prepared to convey his copyrights to Sylvania pursuant to the Agreement for additional consideration and actually thought that was

the deal he had made.  He later learned he was getting less consideration and retaining the copyrights. Tr.151.  What in essence happened by Sylvania's failure to meet its attribution obligations under Para 10.b is that Sylvania took the benefit of the bargain Picone thought he had made for more consideration, i.e. Sylvania did not provide attribution under Para 10.b but it compensated PIC as though it had provided that attribution. Appropriate damages would provide PIC with what it would have received under terms that gave Sylvania unlimited licenses without an attribution obligation.   The answer to that inquiry is found in OSI-452, Picone's proposal attached to his memo of March 15, 2006.  Picone made a proposal of a $6 million dollar royalty and an additional payment of $6.5 million, an 80% surcharge over his regular professional rates. Picone in his proposal notes that the standard licensing fee structure calls for a 300% charge for unlimited licenses which would total $10.8 million.  Professor Sedlik confirmed that the industry standard is 300% for unlimited licenses. Using the numbers in the proposal, I find that  PIC  is entitled to damages equal to the industry standard for professional fees for an unlimited license or $10.8 million and a $3 million royalty for past Images and infringements  for a total of $13.8; PIC has already received a $3 million royalty and professional fees of $3.6 million for a total of $6.6 million.  The difference is $7.2 million which represents the breach of contract damages resulting from Sylvania's failure to comply wit the attribution provisions of the Agreement.Para 6.b of the Agreement provides that the retainer amount designed to provide professional fees calls for an annual adjustment commensurate with any change in the CPI.  When I apply the CPI to the damages of $7.2 million, the total is $8,752,950.22. Interestingly, it is a number that is within range of Dr. Sullivan's figure for breach of contract damages for Sylvania alone, but my calculation is not tied to the number of Images without attribution.  An unlimited license suggests there is no relevant number of Images to consider.

## **MOTION TO STRIKE THE BUCCHINO INFRINGEMENT REPORT**

Sylvania has moved to exclude the testimony and 'Infringement Report' of Len Bucchino" (the "Motion to Exclude Bucchino"). Sylvani argues, principally, that Bucchino's testimony is tainted by a contingent-fee arrangement he had with the company that owns PIC at the outset of his engagement. It also claims that Bucchino's report is hearsay because it relied on documents provided by PIC and its counsel and because it relied on third-party software services.

As I noted above, I conclude that Bucchino's testimony is not tainted by his initial fee arrangement and counsel for Sylvania had ample opportunity to cross-examine Bucchino regarding the initial fee arrangement, his hourly fee arrangement and his report. 929:21-930:8; 1131:16-1133:9 I think that is the better approach for a witness such as Bucchino.  There is nothing inherently disqualifying about the history of the Bucchino fee arrangement and cross-examination did not disclose anything.  My ruling is generally supported by the cases cited by PIC. Each has its own facts but the theme is not to exclude testimony unnecessarily and rely on disclosure and examination.  That occurred and I am satisfied that Bucchino's testimony should be allowed.  See Morris v. Rhode Island Hosp., No. CA 13-304-ML, 2014 WL 3107296, at *11 (D.R.I. July 7, 2014) (explaining that, where a witness is promised a contingent fee, "the better approach is to explore the potential of witness bias through vigorous cross-examination at trial, rather than by complete exclusion" (citing Crowe v. Bolduc, 334 F.3d 124, 133 (1st Cir. 2003))); accord United States v. Levenite, 277 F.3d 454, 462-63 (4th Cir. 2002); Tagatz v. Marquette Univ., 861 F.2d 1040, 1042 (7th Cir. 1988); Universal Athletic Sales Co. v. Am. Gym, Recreational & Athletic Equip. Corp., 546 F.2d 530, 539 (3d Cir. 1976).

.

Sylvania's reliance on Straughter v. Raymond is not persuasive.  The witness in Straughter replaced one contingency fee arrangement with another.  See No. CV 08-2170 CAS (CWx), 2011 WL 1789987 (C.D. Cal. May 9, 2011). Although the witness's compensation was amended to eliminate a contingent fee, "a de facto contingency fee arrangement remaine[d]." Id. at *3. In particular, the "[p]laintiff admit[ted] that he cannot afford to pay [his expert witness's] hourly rate, and in order to secure his obligation, plaintiff has provided [the expert witness] a lien on any recovery he may obtain in this action. Thus, as a practical matter, [the expert witness] will not be paid for her work unless and until plaintiff recovers a sum of money in connection with this case." Id. Here, in contrast, no such "de facto contingency fee arrangement" existed at the time of the Final Hearing.

I further decline to exclude Bucchino's Infringement Report on the ground that it constitutes hearsay. Initially, I note that under the rules governing this proceeding, "[c]onformity to legal rules of evidence shall not be necessary." AAA Commercial Arbitration Rule R-34(a); see also LJL 33rd St. Assocs., LLC v. Pitcairn Properties Inc., 725 F.3d 184, 194 (2d Cir. 2013) ("[I]t is indisputably correct that arbitrators are not bound by the rules of evidence and may consider hearsay….").

In any event, I conclude that Bucchino's Infringement Report does not constitute hearsay. Sylvania  argues that the infringement report is (1) not a business record; (2) not a summary of voluminous records; and (3) not subject to the rule permitting experts to rely on hearsay if of a type reasonably relied upon by experts in the field. The infringement Report does not satisfy the definition of hearsay.tSee Fed. R. Evid. 801(c) ("'Hearsay' means a statement that: (1) the

declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement.").

Sylvania first claims that the Infringement Report constitutes hearsay because many of the infringing uses were identified in "PDF files and screenshots that [Bucchino] received from Picone and PIC's counsel." The underlying PDF files and screenshots are part of the evidentiary record in this arbitration, however, and Bucchino's report reflects his analysis of those documents, not merely a parroting of their substance. There was no testimonial statement made by any declarant in these documents that PIC sought to put into evidence through the Infringement Report to establish the truth of the matter asserted in the statement.

Sylvania also claims that Bucchino's report is inadmissible because it relied, in part, "on third-party software products, TinEye and Incandescent," to identify infringing uses. But again, that mischaracterizes the Infringement Report insofar as Sylvania claims that it repeats any out-of-court statements by Tineye or Incandescent. Rather, even as to infringing uses that Bucchino initially identified using those services, the Infringement Report reflects Bucchino's own personal, firsthand knowledge of the infringing uses resulting from his own investigation; Tineye and Incandescent merely provided tools that Bucchino used in carrying out parts of his investigation. Moreover, as Bucchino described in detail, the Infringement Report does not merely parrot the raw data output provided by Tineye or Incandescent. Rather, that output was the starting point of an iterative process in which a team including Bucchino, himself, verified that each "hit" or "match" identified by the Tineye or Incandescent tools did, in fact, match a PIC Image and did, in fact, omit a proper copyright notice and/or attribution. Both Bucchino and Picone provided an unrefuted evidentiary foundation for this process based on their firsthand knowledge.

I personally observed Mr. Bucchino's testimony on both direct and cross.  I found him to be candid, responsive, knowledgeable and credible.  Based on the foregoing, I conclude that Bucchino's testimony, along with the Infringement Report and other reports that he prepared and testified about, are admissible and, therefore, deny the Motion to Exclude Bucchino.

## DAMAGES  FOR BREACH OF CONTRACT

As discussed fully above, PIC alleges that OSI breached the 2 Agreement by failing to pay certain rush charges amounting to $784,467.86. Paragraph 3(c) provides that PIC shall be compensated for "Photography Services" at specified day rates, and that "PIC's professional fees shall otherwise be as specified in Exhibit C attached here." Exhibit C provides for rush charges as follows—

Rush Fees:

Turnaround: Production times are estimated on job-by-job basis.  Five (5) days' notice is expected for in-studio services, and ten (10) days' notice is expected for on-location services. Service cannot be guaranteed if less notice is provided.  Where service can be provided, the following rush charges may be applied at PIC's discretion:

| | Rush Charges | |
|---|---|---|
| Days' Notice (X) | In-Studio Services | On-Location Services |
| 10 days > X > 5 days | No rush charge | Add up to 100% |
| 5 days ≥ X > 48 hours | Add up to 100% | Add up to 200% |
| 48 hours ≥ X > 24 hours | Add up to 200% | Add up to 300% |
| X ≥ 24 hours | Add up to 300% | Add up to 300% |

Additionally, ¶ 13(a) requires PIC to "issue separate invoices for Photography Services and Image Management Services." Paragraph 13(g) provides that "[i]nvoices, to the extent not covered by a positive retainer balance, shall be due and payable sixty (60) days from receipt."

"Under Massachusetts law, to prove a breach of contract claim, a plaintiff must show: (1) the existence of a valid and binding contract, (2) that the defendant breached the terms of the contract, and (3) that the plaintiff has suffered damages from the breach." D&N Corp. v. Intoccia, 32 N.E.3d 368 (Mass. App. Ct. 2015). As set forth above, the parties do not dispute that the Agreement is a valid and binding contract, and I thus conclude that it is.

I conclude that OSI breached the terms of the 2006 License Agreement permitting PIC to assess and invoice OSI for rush charges and requiring OSI to pay the invoices 60 days from receipt. In particular, I have already found that PIC was entitled to invoice, and did invoice, OSI for rush charges in the amounts of $286,470 and $353,670 related to the 2010 and 2012 Lightfaire Booth Guides, respectively. See Exs. J-6 and J-7. OSI conceded that PIC was contractually entitled to assess both rush charges. 1811:8-13 (Colotti) (addressing 2010 charge), 1789:21-1790:10, 1803:12-1805:3, 1806:5-9 (Colotti) (addressing 2012 charge). Moreover, OSI concedes that it failed to pay these charges. 1779:17-24, 1781:5-10, 1792:15-18 (Colotti).

I also have already found that OSI's proffered reasons for failing to pay these rush charges are unavailing. First, although OSI contends as to the 2010 charge that a "gentleman's agreement" existed between PIC and OSI that PIC would not assess rush charges, OSI's own testimony suggests both that any such agreement post-dated the 2010 charge, see 1778:23-1779:4 (Colotti) (gentleman's agreement was not reached until August 2010, although PIC notified OSI that it was calculating the charges as of July 7, 2010), and that any such agreement terminated shortly after the charge was invoiced, 1818:21-1819:3 (Colotti) (any gentleman's agreement was over by September 3, 2010); Ex. PIC-484. Additionally, as I have already observed, ¶ 43 of the 2006 License Agreement requires that any modification of the agreement be in writing, see Ex. J-2 ¶ 43, and OSI understood this unambiguous contractual requirement,

see 1773:13-1774:3 (Colotti). Yet, OSI concedes that there is no email, document, or any other writing evincing a purported "gentlemen's agreement" modifying the 2006 License Agreement to restrict PIC's right to assess and collect rush charges. 1768:23-1769:4, 1771:23-1772:8, 1775:9-12 (Colotti).

Second, although OSI seeks to avoid payment of the rush charges because PIC did not invoice them within 30 days as required by ¶ 13(e) of the 2006 License Agreement, see Ex. J-2 ¶ 13(e), I conclude as a matter of law that this requirement does not excuse OSI's obligation to pay fees to which PIC was entitled to invoice and did invoice. Indeed, OSI conceded that it understood that PIC's invoicing rush charges outside the 30-day window did not mean that OSI would not have to pay the charges. 1762:25-1763:12 (Colotti).[18]

Therefore, in view of the record as a whole, I conclude that the parties entered no binding modification of the 2006 License Agreement or other binding agreement that precluded PIC from enforcing its uncontested rights to rush charges.

I further conclude that PIC suffered damages from the breach because it was deprived of the rush charges that it was entitled to assess and invoice OSI for under the 2006 License Agreement, plus contractual interest. As set forth above, the invoice amounts, which OSI does not contest and I thus conclude were properly calculated under the 2006 License Agreement, were $286,470 and $353,670 for the 2010 and 2012 Lightfaire Booth Guides, respectively. PIC was harmed by OSI's wrongfully depriving PIC of these amounts.

Moreover, ¶ 15 of the 2006 License Agreement entitles PIC to collect interest on any payment under the agreement not timely made "at the prime rate (as published in the Wall Street

---

[18] In any event, insofar as PIC provided invoices outside the 30-day window, I conclude that it did so at OSI's direction. 368:6-369:1. Moreover, Picone never took the position that PIC could terminate OSI's rights under the 2006 License Agreement due to OSI's late payments. 1759:6-14, 1760:16-1761:3, 1761:15:1762:2 (Colotti); 369:8-20 (Picone); 371:15; Ex. PIC-19.

Journal as of the date such payment is due) plus two percentage points per annum" from the due date until the past-due amounts are paid in full. Ex. J-2 ¶ 15. I observe that the Wall Street Journal prime rate at the due date of both invoices in issue was 3.25 percent.[19] So contractual interest has accrued since the invoices' respective due dates at a rate of 5.25 percent per annum on the principal amount of the invoices. Applying this rate, as of September 8, 2017, the date of the closing argument in this arbitration, interest had accrued on the 2010 invoice, see Ex. J-6, in the amount of $104,044.47, and interest had accrued on the 2012 invoice, see Ex. J-7, in the amount of $93,915.30. I therefore conclude that interest on the unpaid invoices in the total amount of $197,959.77. PIC was also harmed by OSI's wrongful deprivation of contractual interest owed to PIC.

Accordingly, I conclude that PIC has established all the elements of its claim against OSI for breach of contract for failure to pay rush charges. OSI is thus liable to PIC for breach of ¶¶ 3(c), 13(a), and 13(g) of the 2006 License Agreement.

Similarly for the reasons discussed above, I find that PIC has established all of the elements of its claim against OSI for breach of contract for failing to comply with the attribution provisions of Para 10.b.  As discussed above I found IC entitled to damages of $7.2 million as a direct consequence of Sylvania' breach and after applying a CPI factor pursuant to Para 6.b of the Agreement, the damages total $8,752,950.22.

## MOTION TO STRIKE SULLIVAN REORT

---

[19] The Wall Street Journal prime rate was 3.25 percent from December 16, 2008, through December 17, 2015. *See* http://www.fedprimerate.com/wall_street_journal_prime_rate_history.htm. As this information can accurately and readily be determined from sources whose accuracy cannot reasonably be questioned, it is the kind of information of which it would be appropriate to take judicial notice. *See* Fed. R. Evid. 201(c)(2). I therefore take the Wall Street Journal prime rate during the relevant period as established for the purpose of this arbitration.

As a preliminary matter, on June 22, 2017, in the midst of the Final Hearing and on the eve of Dr. Sullivan's testimony, Defendants submitted their "Motion in Limine to Exclude Testimony and Expert Reports of Ryan Sullivan, Ph.D" (the "Motion to Exclude Dr. Sullivan"). Defendants claim that Dr. Sullivan's testimony is "irrelevant" and "unreliable" for the following reasons: (1) Dr. Sullivan incorrectly concluded that the invoice prices that OSI paid under the 2006 License Agreement were part of the license fee for the PIC Images; (2) Dr. Sullivan incorrectly applied a multiplier to account for use without notice and/or attribution; (3) Dr. Sullivan did not apply a deduction to the infringers' profits to account for overlap with actual damages; (4) Dr. Sullivan did not analyze apportionment of the infringers' profits among causal factors; and (5) Dr. Sullivan did not demonstrate that the PIC Images were eligible for statutory damages under 17 U.S.C. § 412.

"The focus of a Daubert inquiry 'must be solely on principles and methodology, not on the conclusions that they generate.'" Martinez-Morales v. Victaulic Co., No. CIV. 11-1660 MEL, 2013 WL 2443871, at *4 (D.P.R. June 5, 2013) (quoting Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 595 (1993)). Thus, when a party moving to exclude expert testimony "focuses on disputing [the expert's] conclusions, the appropriate means of attacking such evidence is vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." Id. (brackets and internal quotation marks omitted). Moreover, factual disputes are matters for resolution by the finder-of-fact and not to be decided in connection with a motion to exclude expert testimony "so long as the evidence could reasonably support the assumptions on which the expert's opinion is based." Nna v. Am. Standard, Inc., 630 F. Supp. 2d 115, 136 (D. Mass. 2009); accord Iconics, Inc. v. Massaro, --- F.

Supp. 3d ----, 2017 WL 3083160, at *6 (D. Mass. 2017) ("Such factual disputes fall outside the proper scope of a Daubert inquiry.").

I conclude that Sylvania's complaints about Dr. Sullivan's testimony dispute either the conclusions that Dr. Sullivan reaches or the facts he assumes for the purpose of his analysis, not his methodology. Accordingly, they all relate to the weight, but not the admissibility, of Dr. Sullivan's testimony and reports. Defendants had ample opportunity to cross-examine Dr. Sullivan and present contrary evidence, and I consider Dr. Sullivan's testimony and reports in the context of the record as a whole. I conclude that Dr. Sullivan's testimony and reports admissible and, therefore, deny the Motion to Exclude Dr. Sullivan. In any event, as noted above, I have not adopted Dr. Sullivan's damages analysis in reaching my determination.

## ATTORNEYS' FEES

PIC seeks an award of attorneys' fees for its copyright-infringement, DMCA, and breach-of-contract claims. Although under the "American Rule," a "litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise," Baker Botts L.L.P. v. ASARCO LLC, 135 S. Ct. 2158, 2164 (2015), PIC has identified statutory or contractual bases for recovery of attorneys' fees for these claims. I therefore address each claim below.

"In any civil action [for copyright infringement], the court in its discretion may allow the recovery of full costs by or against any party…. [T]he court may also award a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505. "A prevailing party is one who has prevailed on the merits of at least some of his claims." Spooner v. EEN, Inc., 644 F.3d 62, 66 (1st Cir. 2011) (internal quotation marks omitted). PIC, however, prevailed on

84

neither its copyright claim or its DMCA claim and therefore is not the prevailing party on those claims and is not entitled to an award of attorneys' fees and costs regarding those claims.

Attorneys' fees and costs, however, may be assessed when a valid contract between the parties so provides. Blue Hills Office Park LLC v. J.P. Morgan Chase Bank,, 477 F. Supp. 2d 366, 388 (D. Mass. 2007) (citing Broadhurst v. Director of Div. of Employment Sec., 369 N.E.2d 1018, 1020 (Mass. 1977)). "[W]hen a contractual fee provision is included by the parties, the question of what fees are owed is ultimately one of contract interpretation, and our primary obligation is simply to honor the agreement struck by the parties." AccuSoft Corp. v. Palo, 237 F.3d 31, 61 (1st Cir. 2001) (applying Massachusetts law) (internal quotation marks omitted).

The 2006 License Agreement provides, in relevant part:

> If any legal action, arbitration, or other proceeding is brought for a breach of this Agreement or any of the warranties herein, the prevailing party shall be entitled to recover its reasonable attorneys' fees and other costs incurred in bringing such action or proceeding, in addition to any other relied to which such party may be entitled.

> J-002 ¶ 39.

I conclude that under ¶ 39 of the 2006 License Agreement, PIC is entitled to recover its reasonable attorneys' fees and costs incurred in bringing its breach-of-contract claims. In particular, I have previously concluded that PIC established all the elements of its two claims against OSI for breach of the 2006 License Agreement: (1) failure to pay rush charges; and (2) failure to comply with the attribution provisions of the Agreement. As PIC is the "prevailing party" with respect to these claims. PIC also is the "prevailing party" with respect to OSI's claims that PIC breached the implied covenant of good faith and fair dealing as to the 2006 License Agreement, and for a declaration judgment regarding the parties' rights under the agreement. Therefore, the contract makes an award of fees mandatory. See Pittman v. Zoar

Outdoor Adventure Resort, Inc., No. CV 16-30182-MGM, 2017 WL 2962891, at *3 (D. Mass.

June 9, 2017) (concluding that parties' use of the word "shall" demonstrated mandatory nature of

venue clause in contract governed by Massachusetts law); Bay State St. Ry. Co. v. City of

Woburn, 122 N.E. 268, 268 ( Mass. 1919) ("The word 'shall' in its ordinary signification is

mandatory and not permissive.").

## REMAINING CLAIMS

PIC's copyright and DMCA claims against Sylvania and against Trade Service and the

other Third Party Defendants are dismissed in accordance with my finding of no copyright

infringement. In addition, I dismiss the claims of all of the parties under M.G. L. 93A, sections 2,

11.  None of the conduct alleged rose to the level of unfair and deceptive business practices that

would warrant recovery under Section 11.  PIC had a good faith basis to pursue its copyright

claims; that it did not prevail does not convert its actions to violations of 93A.  Similarly,

inasmuch as PIC did not recover on its copyright claims against Sylvania or the Third Party

Defendants, its 93A claims based on the same underlying activities did not constitute a violation

of  93A and are dismissed. PIC's breach of contract claim against Sylvania under Paragraph 18

of the Agreement is dismissed, as is PIC's claims for tortious interference.  PIC did not pursue its

Trademark claim and it is dismissed. The claim for breach of the duty of good faith and fair

dealing is no broader that the contract claims on which PIC prevailed and there is no additional

relief due under that claim.

Sylvania asserted six (6) claims, all of which seem to stem from PIC's actions in suing

Sylvania's customers and pursuing copyright claims that Sylvania argues were without merit.

Although PIC failed to recover on the copyright claims, I cannot say that its actions were

frivolous or in bad faith. After all, it was Sylvania's breach of contract that created the claims. Accordingly, I dismiss Sylvania's claims.

As noted above, PIC is the prevailing party under the Agreement which has a provision for the recovery of reasonable attorneys' fees and costs. Sylvania, on the other hand, was the prevailing party on the copyright claims. The parties shall file on or before December 4, 2017 any fee applications and shall file any replies no later than December 11, 2017.. I will defer the allocation of administrative costs of the AAA and arbitrator fees until determination of the fee applications.

## CONCLUSION

In accordance with my findings and conclusions, Sylvania (OSI) shall pay to PIC the amount of $9,591, 049.99.

This Partial Final Award is in full settlement of all claims and counterclaims submitted to this Arbitration with the exception of the attorneys' fees and costs and AAA and arbitrator fees and costs as noted above. All claims not expressly granted herein are hereby denied.

Dated: November 20, 2017

Bernard J. Bonn III, Arbitrator